**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Richard Edison BOYD, a/k/a Jake**
**Boyd, Defendant–Appellant.**

No. 94–5156.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1995.

Decided May 5, 1995.

**ARGUED:** James Joseph Nolan, Jr., Pierson, Pierson & Nolan, Baltimore, MD, for appellant. Jefferson McClure Gray, Asst. U.S. Atty., Baltimore, MD, for appellee. **ON BRIEF:** Lynne A. Battaglia, U.S. Atty.,

James G. Warwick, Asst. U.S. Atty., Baltimore, MD, for appellee.

Before NIEMEYER and HAMILTON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Judge NIEMEYER and Senior Judge BUTZNER joined.

## OPINION

HAMILTON, Circuit Judge:

Richard Edison Boyd (Boyd) appeals his conviction on two counts of conspiracy to possess with intent to distribute and to distribute marijuana, see 21 U.S.C.A. §§ 841(a)(1) and 846 (West 1981 & Supp. 1994), and three substantive counts of possession with intent to distribute marijuana, see 21 U.S.C.A. § 841(a)(1) (West 1981 & 1994). We affirm.

### I.

During the late 1980s, Boyd lived an illegal but lucrative double life. Although he held a regular job at the Rohm & Haas plant in Galveston Bay, Texas, the evidence at trial established that Boyd also supplied large quantities of marijuana to James Todd Hibler in Maryland. Boyd obtained the marijuana he sold from two different sources in Baytown, Texas. One source was Manual Jaramillo (Jaramillo); the other was brothers Joseph and Arthur Nieto.

The government's evidence established at trial that from December 1988 through November 1989, Boyd, through various middlemen, namely, Scott Jordan (Jordan), Aubrey Clevenger (Clevenger), and Scott Ianaro (Ianaro), supplied marijuana to Hibler. Generally, the marijuana, in quantities of forty to sixty pounds, was transported by truck from Texas to Maryland.

On October 7, 1993, Boyd, Jaramillo, and brothers Joseph and Arthur Nieto were indicted for conspiracy to possess with intent to distribute and to distribute marijuana and other related offenses. After Jaramillo pled guilty to conspiracy to possess with intent to distribute and to distribute marijuana, see 21 U.S.C.A. §§ 841(a)(1) and 846 (West 1981 & Supp.1994), the grand jury returned a superseding indictment. The superseding indictment contained six counts, charging two conspiracies—one involving Hibler, Jordan, and Boyd being supplied by Jaramillo and the second involving Hibler, Jordan, Clevenger, and Boyd being supplied by the Nieto brothers. In addition to the two conspiracies, the indictment charged Boyd with three substantive counts of possession with intent to distribute marijuana, see 21 U.S.C.A. § 841(a)(1) (West 1981 & 1994). The sixth count related solely to Joseph Nieto. Boyd and the Nieto brothers proceeded to trial, and after the jury was sworn, the Nieto brothers entered into a plea agreement whereby they pled guilty to the conspiracy count that related to them. The jury returned its verdict on November 8, 1993, finding Boyd guilty on the five counts of the superseding indictment that related to him. The district court sentenced Boyd to seventy-eight months' imprisonment and four years supervised release. Boyd filed a timely appeal raising numerous issues. While we have carefully considered them all, we address only three, concluding that the others are completely without merit.

### II.

First, Boyd argues his conviction should be reversed because the district court erred in refusing to require the government to produce eleven reports prepared and signed by Drug Enforcement Administration (DEA) Case Agent Dennis Howell (Howell) during the investigation of the charged conspiracies, and in failing to conduct an in camera inspection to determine if the reports were producible pursuant to the Jencks Act, 18 U.S.C.A. § 3500 (West 1985). We find Boyd's argument to be without merit.

The Jencks Act provides that after a witness for the government has testified on direct examination in a criminal case, the government must "produce any statement (as hereinafter defined) of the witness in the possession of the United States which *relates to the subject matter as to which the witness has testified.*" 18 U.S.C.A § 3500(b) (West

1985) (emphasis added); *United States v. Snow,* 537 F.2d 1166, 1168 (4th Cir.1976) (the Jencks Act only applies to an "existing prior statement of a government witness concerning matters covered by direct examination"). Under the Jencks Act, a "statement" is:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded or transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C.A. § 3500(e). "Notes taken by … government agents during a pretrial interview of a witness may qualify as a 'statement' of the witness under § 3500(e)(1) if the witness has reviewed them in their entirety—either by reading them himself or by having them read back to him—and formally and unambiguously approved them—either orally or in writing—as an accurate record of what he said during the interview." *United States v. Smith,* 31 F.3d 1294, 1301 (4th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1170, 130 L.Ed.2d 1124 (1995).

■ If the government refuses a defendant's request for material under the Jencks Act on the basis that the material sought is not in fact a statement under the Jencks Act, then the district court is obligated to conduct an independent inquiry into the circumstances surrounding the materials sought by the defendant in order to make its own determination. *Id.* at 1302. District courts have " 'substantial latitude' " in deciding what this inquiry will entail. *Id.* (quoting *Matthews v. United States,* 407 F.2d 1371, 1376 (5th Cir.1969), *cert. denied,* 398 U.S. 968, 90 S.Ct. 2177, 2178, 26 L.Ed.2d 554 (1970)). Although we have opined that this inquiry normally should begin with an *in camera* inspection of the materials sought, we have observed that the district court may dispense with this exercise if "it is clear that they cannot be Jencks Act material." *Id.* at 1302. In other words, a defendant must provide some foundation for his Jencks Act request before the district court is required to make an *in camera* inspection. *See United States v. Nickell,* 552 F.2d 684, 689–90 (6th Cir. 1977), *cert. denied,* 436 U.S. 904, 98 S.Ct. 2233, 56 L.Ed.2d 402 (1978) (Holding that it is not an abuse of discretion for the district court to refuse either to order the government to produce or to screen materials *in camera* if the defendant fails to provide a foundation for the government to turn over any materials as Jencks Act statements, or for the court to screen any materials.). Such a foundation, typically established through cross examination of the witness whose statement the defendant is attempting to obtain, requires the defendant to specify with reasonable particularity that material which may be a Jencks Act statement exists. *See United States v. Robinson,* 585 F.2d 274, 280–81 (7th Cir.1978), *cert. denied,* 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979). Whether, and to what extent, the material sought must be produced are questions of fact to be decided by the district court and will not be overturned unless clearly erroneous. *See United States v. Medel,* 592 F.2d 1305, 1316 (5th Cir.1979).

■ Boyd sought from the government eleven reports prepared and signed by Howell that the government asserts summarized meetings with various witnesses, listed dates when witnesses testified before the grand jury, recorded general case development information such as the dates when indictments were returned on various co-defendants and when they entered guilty pleas. The record reveals that the district court's determination that these reports were not producible under the Jencks Act was not clearly erroneous because Boyd failed to provide even the barest of foundation for his assertion that the information contained in the eleven reports related to Howell's testimony on direct examination.

Howell's direct examination consisted of only forty pages in the lengthy trial transcript and was primarily limited to: (1) how he obtained the hotel and telephone records the government subsequently introduced into evidence; (2) how he established Boyd's home and work telephone numbers for 1989;

and (3) authentication of two charts detailing calls placed by Ianaro and Hibler to Boyd's home and work telephone numbers between June and October 1989. Additionally, Howell very briefly testified that he had made several expense payments totaling $500 to Ianaro and Jordan during the investigation; that he initially debriefed Jaramillo in the latter part of October 1992; and that his practice was to talk to witnesses one at a time.

In contrast to the government's limited direct examination of Howell, Boyd's cross examination strayed far beyond the scope of the government's direct examination.[1] On cross-examination, Boyd asked Howell if he recalled the dates of every report that mentioned the name "Boyd." Without consulting any reports, Howell testified that he had prepared ten or eleven reports during his work on the investigation between September 1991 and March 1993 and the reports contained Boyd's name. Aside from eliciting the general dates that Howell prepared the reports, however, Boyd never asked Howell any questions about *their contents* or even *their general subject matter.*

Only once did Boyd request the production of a specific report prepared by Howell. After Howell mentioned he had prepared a report in September 1991, following a meeting with Ianaro, Boyd requested that it be produced without specifying the ground for his request. Assuming Boyd intended to premise his request on the Jencks Act, the district court reviewed the report *in camera* and found no basis for producing it under the Jencks Act. The district court ruled that the report did not constitute a Jencks Act "statement" because: (1) there was no indication in the record that Ianaro ever reviewed or approved the contents of the report; and (2) the report was not a substantially verbatim transcription of the Howell–Ianaro meeting. After his request relating to the September

1991 report was denied, defense counsel made a general request that all of Howell's reports "be submitted to the Court for examination *in camera* ...." (J.A. 1049).[2] In denying this request, the district court found that Boyd had not provided a sufficient foundation for such an exercise; specifically, Boyd had failed to specify with any particularity, let alone reasonable particularity, that the reports contained statements by Howell that related to his direct examination testimony. Given this finding, the district court concluded that the reports did not contain Jencks Act statements.

Given Boyd's failure to provide a foundation for his request, we conclude the district court did not abuse its discretion in failing to conduct an *in camera* inspection of the reports. *See Robinson,* 585 F.2d at 280–81. It follows that the district court's determination that the reports did not contain Jencks Act statements is not clearly erroneous. Boyd has simply failed to show that he complied with the dictates of the Jencks Act and thus has equally failed to show that his request for the reports was anything more than a fishing expedition. *See United States v. Graves,* 428 F.2d 196, 199 (5th Cir.) ("The [Jencks] Act does not authorize fishing expeditions by the defendant ... and use of statements under the Act is limited to impeachment."), *cert. denied,* 400 U.S. 960, 91 S.Ct. 360, 27 L.Ed.2d 269 (1970).

### III.

■ Next, Boyd argues his conviction should be reversed because the district court abused its discretion in permitting the government to use his and his wife's 1990 Joint Federal Income Tax Return (Joint Return), claiming losses due to a fire that destroyed their mobile home in April 1990, to cross-examine them about the value of the furni-

---

1. Boyd's cross examination of Howell covers 369 pages of trial transcript, approximately nine times longer than the government's direct examination. The government repeatedly objected that Boyd's cross examination of Howell was beyond the scope of the direct examination and therefore was improper under Fed.R.Evid. 611. The district court, with evident misgivings, permitted the questioning under Fed.R.Evid. 611(b), which authorizes the district court, in its discretion, to

"permit inquiry into additional matters as if on direct examination"—to avoid recalling Howell during the defense's case.

2. On appeal, Boyd does not contend that he is entitled to the reports on the basis that they contained statements of a cooperating witness, although the record is unclear whether he made this contention during the trial.

ture and other personal assets they acquired during the time of the charged conspiracies.[3] Specifically, Boyd challenges the use of the Joint Return on relevancy grounds, see Fed. R.Evid. 401, 402, and as impermissible character evidence, see Fed.R.Evid. 404(b). We review a district court's evidentiary ruling for an abuse of discretion. See *United States v. Russell*, 971 F.2d 1098, 1104 (4th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1013, 122 L.Ed.2d 161 (1993). Boyd's theory of defense, as he and his wife testified at trial, was that he did not live the spendthrift lifestyle of a drug dealer, but rather lived a normal lifestyle commensurate with his legitimate income. In order to impeach this testimony, the government cross-examined the Boyds regarding the losses claimed on the Joint Return. Boyd conceded on redirect examination that he had inflated the figures, but testified he did so on the instruction of his accountant.

### A.

■ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R.Evid. 401. "Evidence which is not relevant is not admissible." Fed.R.Evid. 402. To rebut the government's allegations that he was a member of the charged conspiracies, Boyd attempted to show that his possessions and lifestyle were consistent with his earnings from legitimate employment. Obviously, the Joint Return, itemizing rather significant expenditures by Boyd on personal property compared to his annual income during the time of the charged conspiracies, was

relevant to rebut Boyd's contention that his lifestyle was not commensurate with that of a drug dealer. Therefore, the Joint Return was not subject to a relevancy challenge. See Fed.R.Evid. 401, 402.

### B.

■ Boyd's argument that the use of the Joint Return by the government constituted improper use of character evidence, see Fed. R.Evid. 404(b), founders as well. The Joint Return was not evidence of bad character; indeed, at the time the government used the Joint Return, all parties, and the district court, believed the Joint Return contained accurate information. Rather, the Joint Return was impeachment evidence, employed to impeach the Boyds' earlier testimony that they lived a normal lifestyle, commensurate with their legitimate income. Of course, the use of the Joint Return allowed the government to undermine the Boyds' credibility, but that is the purpose of impeachment. Accordingly, the government's use of the Joint Return was not improper.[4]

### IV.

Next, Boyd argues the district court abused its discretion in admitting Jordan's testimony that Boyd personally used marijuana and cocaine. According to Boyd, such evidence was only admitted to show he had a bad character, and, therefore, must have committed the crimes of which he was charged. See Fed.R.Evid. 404(b) ("[E]vidence of other crimes, wrongs, or acts is not admissible to show action in conformity therewith."). We disagree.

---

3. The charged conspiracies in this case began in December 1988 and ended in November 1989. In April 1990, Boyd's mobile home in Highlands, Texas burned. When the Boyds filed their Joint Return the following year, they attached a Form 4684 (Casualty and Theft Loss), claiming furniture loss due to fire valued at $11,380. An attachment to the form listed the "original cost" and the year of acquisition for the claimed items of furniture. The attachment claimed Boyd had acquired almost $6,000 in furniture for the trailer in 1988 and $3,750 in 1989. Boyd conceded on cross-examination that the $3,750 in bedroom furniture he claimed to have purchased during the first eight months of 1989 exceeded his com-

bined take home income for the months of March, April, and May.

4. Boyd also argues that the district court erred in allowing the government to use a 1991 insurance claim form submitted by the couple to their insurance company claiming losses due to a house fire in November 1991 to cross examine the Boyds about the value of the furniture and other personal assets acquired in 1988–89. At oral argument, Boyd conceded that he had not preserved this argument for appeal, and, in any event, we conclude that it has no merit.

During redirect examination of Jordan, the government sought to admit the testimony of Jordan, that Boyd had personally used marijuana and cocaine during the time of the charged conspiracies, as proof of his motive. The government's theory was that Boyd participated in the charged conspiracies in order to support his personal drug use. *See United States v. Templeman,* 965 F.2d 617, 619 (8th Cir.) ("Evidence of [defendant's] personal use of cocaine indicates potential motives for his distribution of cocaine: to finance his own use of the drug and to insure himself of a ready supply."), *cert. denied,* —— U.S. ——, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992). Over Boyd's objection, the district court permitted the government to elicit this testimony as proof of Boyd's motive. In this regard, Jordan briefly testified that during 1989, he observed Boyd using marijuana and cocaine.

■■■■ Although evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person in order to show action in conformity therewith, such evidence may be admissible, for other purposes, such as proof of motive or intent. *See* Fed.R.Evid. 404(b). Once a district court has determined that evidence of a defendant's other crime, wrong, or bad act is relevant to prove, for example, motive, then the district court must conduct a balancing test to determine whether the evidence should nevertheless be excluded on the ground that its probative value is substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403. We review the district court's admission of evidence under Rule 404(b) for abuse of discretion, *see United States v. Mark,* 943 F.2d 444, 447 (4th Cir.1991), and may sustain its admission on any theory, regardless of whether the district court admitted the evidence on that theory, *see United States v. Gallo,* 782 F.2d 1191, 1194 (4th Cir.1986).

■■■■ Initially, we conclude that the evidence of Boyd's personal marijuana and cocaine use would be admissible under Rule 404(b) as proof of his motive for participating in the charged conspiracies. *See Temple-*

*man,* 965 F.2d at 619. Additionally, we conclude it would be admissible because it was relevant to show the nature of his relationship with Jordan—that of a co-conspirator. *See generally United States v. Johnston,* 784 F.2d 416, 423 n. 11 (1st Cir.1986) (Defendant's use of cocaine with co-conspirator was admissible as tending to show the nature of their relationship.). That Boyd trusted Jordan enough to allow him to witness him committing an illegal act is clearly probative of the close nature of their relationship, and thus, the likelihood that Jordan was Boyd's co-conspirator.

■■■■ Nor was its probative value substantially outweighed by its prejudicial effect. *See* Fed.R.Evid. 403. Of course, in one sense all incriminating evidence is inherently prejudicial. "The proper question under Rule 404(b), however, is whether such evidence has the potential to cause undue prejudice, and if so, whether the danger of such undue prejudice substantially outweighs its probative value." *Mark,* 943 F.2d at 449. In this case, the balancing test undeniably weighs in favor of admitting the evidence, because the evidence of Boyd's personal use of marijuana and cocaine did not involve conduct any more sensational or disturbing than the crimes with which he was charged. *See United States v. Roldan–Zapata,* 916 F.2d 795, 804 (2d Cir.1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991). Here, the jury heard and credited evidence that Boyd supplied hundreds of pounds of marijuana to Hibler. We conclude that Boyd's personal drug use was far less prejudicial than this evidence, the admission of which Boyd has not challenged on appeal. The evidence at issue was, therefore, admissible.[5]

### V.

Boyd also raises numerous issues that he contends should be resolved in his favor. Boyd contends the district court erred in: (1) excluding evidence relating to his child custody battle with his first wife and other related evidence; (2) finding that the government

---

5. Boyd also asserts that admission of evidence regarding his wife's drug use constitutes reversible error. We need not decide whether the admission of this evidence was error because even if it constituted error, such error was harmless. *See* Fed.R.Crim.P. 52(a).

had established the necessary factual predicate for the admission of statements by his co-conspirators, *see* Fed.R.Evid. 801(d)(2)(E); (3) declining to select a new jury when his two co-defendants had entered guilty pleas immediately after the jury was sworn; (4) permitting Hibler to identify him at trial over his objection that Hibler's pre-trial photographic identification of him was impermissibly suggestive; and (5) failing to *sua sponte* define reasonable doubt when instructing the jury. We have carefully considered each of these arguments and find them to be without merit. The judgment of the district court is affirmed.

*AFFIRMED.*