**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

SEA MARSH GROUP, INCORPORATED;
ELIZABETH R. BULLOCK, in her
capacity as personal representative
of the Estate of R. Gregory Bullock,
<u>Plaintiffs-Appellants,</u>

v.

SC VENTURES, INCORPORATED; EAST
SEABROOK LIMITED PARTNERSHIP; MJ
PROPERTY NORTH AMERICA, LIMITED;
HUGHES & LUCE, a Texas general
partnership; DANIEL K. HENNESSY,
individually and as partners in
Hughes & Luce; JOHN D.
HUTCHINSON, individually and as
partners in Hughes & Luce; ALLAN
B. DIAMOND, individually and as                            No. 94-1140
partners in Hughes & Luce; DAVID
K. HAEDT,
<u>Defendants-Appellees,</u>

and

SCOTT TUCKER; YORKBRANCH,
CORPORATION, N.V.; EVANS 28,
INCORPORATED, N.V.; MJ PROPERTIES
(U.S.A.), INCORPORATED, a Delaware
Corporation; MUWAFFAK AL-
HARITHY; JALEELAH AL-HARITHY;
NAYIL AL-HARITHY; ADEL AL-
HARITHY; NABILA AL-HARITHY;
LALYA AL-HARITHY; REEM AL-
HARITHY,
<u>Defendants.</u>

SEA MARSH GROUP, INCORPORATED;
ELIZABETH R. BULLOCK, in her
capacity as personal representative
of the Estate of R. Gregory Bullock,
Plaintiffs-Appellants,

v.

SC VENTURES, INCORPORATED; EAST
SEABROOK LIMITED PARTNERSHIP; MJ
PROPERTY NORTH AMERICA, LIMITED;
HUGHES & LUCE, a Texas general
partnership; DANIEL K. HENNESSY,
individually and as partners in
Hughes & Luce; JOHN D.
HUTCHINSON, individually and as
partners in Hughes & Luce; ALLAN
B. DIAMOND, individually and as                         No. 96-1524
partners in Hughes & Luce; DAVID
K. HAEDT,
Defendants-Appellees,

and

SCOTT TUCKER; YORKBRANCH,
CORPORATION, N.V.; EVANS 28,
INCORPORATED, N.V.; MJ PROPERTIES
(U.S.A.), INCORPORATED, a Delaware
Corporation; MUWAFFAK AL-
HARITHY; JALEELAH AL-HARITHY;
NAYIL AL-HARITHY; ADEL AL-
HARITHY; NABILA AL-HARITHY;
LALYA AL-HARITHY; REEM AL-
HARITHY,
Defendants.

2

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, Chief District Judge.
(CA-90-1124-2)

Argued: November 2, 1994

Decided: April 11, 1997

Before HALL and HAMILTON, Circuit Judges, and
MACKENZIE, Senior United States District Judge for the Eastern
District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Allan Riley Holmes, GIBBES & HOLMES, Charleston,
South Carolina, for Appellants. Robert Holmes Hood, John K. Blin-
cow, Jr., HOOD LAW FIRM, Charleston, South Carolina; John Phil-
lips Linton, SINKLER & BOYD, P.A., Charleston, South Carolina,
for Appellees. **ON BRIEF:** P. Steven Barkowitz, GIBBES &
HOLMES, Charleston, South Carolina, for Appellants. Joseph C.
Wilson, IV, HOOD LAW FIRM, Charleston, South Carolina; Charles
H. Gibbs, Jr., SINKLER & BOYD, P.A., Charleston, South Carolina,
for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

3

**OPINION**

PER CURIAM:

Elizabeth R. Bullock, in her capacity as the personal representative of the estate of R. Gregory Bullock, and Sea Marsh Group, Inc., appeal the judgment of the district court entered in favor of SC Ventures, Inc. (SCV), and others that were alleged by Mr. Bullock and Sea Marsh, the plaintiffs below, to have improperly interfered with their efforts to obtain financing to purchase SCV's share of the primary parties' common enterprise, East Seabrook Limited Partnership (ESLP). After all of the evidence had been presented to the jury, the district court granted the defendants' motion for judgment as a matter of law.

During the oral argument of the underlying appeal, a substantial question arose as to whether diversity of citizenship existed between the plaintiffs, both of whom were citizens of South Carolina, and SCV. We therefore remanded the case to the district court for it to determine, in the first instance, whether it had properly exercised its subject matter jurisdiction over the dispute.

On remand, the district court found that, for diversity purposes, SCV was a citizen of both Texas and New York, and, thus, that its assertion of jurisdiction had been appropriate. This ruling has also been appealed by Ms. Bullock and Sea Marsh, and the two appeals have been consolidated for disposition.[1] We now affirm the judgment of the district court in all respects.

I.

Mr. Bullock operated a financial planning business from his office on Seabrook Island, South Carolina. In 1984, he was contacted by three sisters who wished to sell approximately 1,100 acres of undeveloped real estate, known as the "Andell tract," situated between the Kiawah Island and Seabrook Island resorts.

_____

[1] The parties have filed supplemental briefs, which we deem sufficient to permit us to decide the jurisdictional issue without further oral argument.

Bullock himself became interested in purchasing and developing the property. In partnership with others, Bullock entered into an option agreement to acquire the Andell tract; in 1987, the option rights were transferred to Sea Marsh, which was owned almost entirely by Bullock. In late 1988, Bullock and Sea Marsh formed a limited partnership with SCV in order to obtain sufficient capital to complete the purchase. Forty-nine percent of the resultant entity, which ultimately became ESLP, was owned by Sea Marsh; Bullock personally owned a one-percent interest, and SCV owned the remaining fifty percent.

The partnership agreement provided that, on or before July 15, 1989, Bullock and Sea Marsh could purchase a controlling interest in ESLP from SCV. After that date, the right to purchase control of the partnership would shift to SCV.

ESLP acquired the Andell tract on January 26, 1989. Soon thereafter, Bullock found himself at loggerheads with SCV's management over the resale of certain commercial parcels and the proposed annexation and zoning of the remainder of the property by the town of Seabrook. In the hope of obtaining financing to exercise his option to purchase control of the partnership from SCV and to develop the Andell tract, Bullock attempted to enlist the assistance of ClubCorp International (CCI) of Dallas, Texas, a major corporation engaged in the business of owning and operating clubs and resort properties.

John Meeske was the president of the resorts division of CCI. On June 30, 1989, Meeske and Bullock met with Stephen Jarchow and John Lang of the Dallas office of Bear, Stearns & Co., a well-known investment banking firm. Jarchow was the senior managing director for real estate activities at Bear, Stearns, and Lang was his assistant.

Following the meeting, Meeske drafted a letter to Bullock and personally delivered it to Jarchow's residence for approval. Jarchow suggested a few minor revisions to the letter, which Meeske incorporated. The letter, dated July 7, 1989, professed CCI's "high level of interest" in the Andell project, and it noted that Bear, Stearns had "expressed enthusiasm about [its] potential involvement" in arranging financing.

However, the letter also related Bear, Stearns's concern that the necessary rezoning of the property still had not been approved by the

town of Seabrook. The letter closed with Jarchow's suggestion that the July 15 deadline imposed by Bullock for consummating the deal be extended by ninety days. The extension was said to be necessary to "allow [CCI] to complete our due diligence, properly structure the . . . deal, and advance the required funds."

It is unclear from the record as to the extent, if any, that the July 7 letter merely memorialized an understanding that had already been reached between Bullock and the others at the June 30 meeting. Nevertheless, on July 6, 1989, the day before the letter from Meeske was purportedly sent, Bullock filed suit in state court to prevent SCV from exercising its option to purchase control of the partnership on or after July 16. SCV removed the action to federal court, but, just prior to a scheduled hearing on the matter, the parties reached a settlement.

Under the terms of the settlement agreement, the existing partnership was dissolved, and Bullock and Sea Marsh were given until September 14, 1989, to purchase SCV's entire interest in ESLP for about $5.2 million. If the transaction failed to materialize as scheduled, SCV would acquire Bullock's and Sea Marsh's interests the following day for approximately $2 million.

Prior to reaching the settlement with SCV, Bullock had filed an affidavit in the district court in which Bear, Stearns was identified as the anticipated source of financing for the purchase of ESLP. Shortly after the settlement had been negotiated, John Hutchinson, SCV's attorney and a partner in the Dallas law firm of Hughes & Luce, telephoned Daniel Hennessy (also a partner in Hughes & Luce, and holder of a one-half interest in SCV) to inform him of the details of the agreement. Hutchinson admits that, during that conversation, he "may have mentioned" that Bullock was seeking financing from Bear, Stearns.

Hughes & Luce, as it happens, had, some time earlier, been retained by Bear, Stearns as its Dallas counsel. Moreover, a third Hughes & Luce partner, Allan Diamond, had been close friends with Jarchow for twelve years. Diamond and Jarchow lunched together on July 19, 1989, accompanied by Paul Berry, yet another Hughes & Luce attorney. During the course of the meal, Diamond mentioned that MJ Properties, whose president, David Haedt, owned the other

6

half interest in SCV, might itself seek Bear, Stearns's assistance in financing SCV's anticipated purchase of Bullock's and Sea Marsh's interests in ESLP.

The next day, July 20, Jarchow met with Bullock, Meeske, and John Kruse (the latter representing a South Carolina group that had agreed to provide Bullock with additional financing to develop the tract) to inform them that Bear, Stearns had rejected the financing proposal discussed at the June 30 meeting. Jarchow explained that a conflict of interest prevented Bear, Stearns from dealing simultaneously with Bullock and MJ Properties regarding the Seabrook property.

On September 14, 1989, the deadline previously agreed upon, Bullock moved in the district court to restrain SCV from exercising its right under the settlement agreement to purchase ESLP. The district court denied the motion on September 29, 1989, and SCV tendered payment to Bullock and Sea Marsh forthwith.

Bullock, on behalf of himself and Sea Marsh, then filed a second lawsuit in state court. That action was also removed to the district court. The amended complaint identified numerous defendants, including SCV, ESLP, Hughes & Luce, Hutchinson, Diamond, Hennessy, MJ Properties, and Haedt. Bullock alleged that SCV and its owners and officers had breached their fiduciary duties arising out of SCV's partnership with him and Sea Marsh, and he asserted a panoply of other claims against various combinations of defendants, including claims for fraud, breach of the partnership agreement, and tortious interference with contractual relations.

On May 6, 1993, the district court dismissed, for want of personal jurisdiction, the claims against the Hughes & Luce partners (Hutchinson, Hennessy, and Diamond) and the firm itself. The claims against the remaining defendants proceeded to trial before a jury on December 6, 1993.

During the trial, the district court excluded certain evidence proffered by the plaintiffs in support of their claims, including (1) the initial draft of Meeske's July 7, 1989, letter to Bullock; (2) Meeske's testimony that Jarchow had approved the letter that was actually sent;

7

(3) testimony by Meeske, Bullock, and Kruse regarding certain remarks made by Jarchow at their July 20 meeting; and (4) evidence of acts committed by SCV prior to the dissolution of ESLP, allegedly demonstrating an ongoing plan to interfere with Bullock's efforts to purchase control of the partnership.

Following the close of all of the evidence, the district court granted the defendants' motion, pursuant to Fed. R. Civ. P. 50(a), for judgment as a matter of law as to each of the plaintiffs' claims. Bullock and Sea Marsh appealed, and we heard oral argument of the matter on November 2, 1994.

At the outset of the oral argument, we questioned the parties at length concerning whether subject matter jurisdiction over the dispute, which had been based on the alleged diversity of citizenship between the plaintiffs and the defendants, had existed in the district court. The discussion was occasioned by the mention in a footnote to the appellants' brief that, although no specific findings had been made below regarding the citizenship of SCV, certain facts lent credence to the notion that it had been, like the plaintiffs, a citizen of South Carolina.

We were unable to determine from the record then before us whether the exercise of federal jurisdiction over the underlying action was appropriate. Hence, on November 29, 1994, we ordered a limited remand to the district court so that it might take such evidence as necessary to resolve the issue.

By order filed March 14, 1996, the district court ruled that SCV was not a citizen of South Carolina, and, thus, that complete diversity of citizenship existed between the parties on either side of the dispute. This order is also now before us for review as the result of a second appeal filed by Bullock and Sea Marsh, and, inasmuch as the correctness of the district court's ruling bears directly on our jurisdiction to consider the initial appeal, we address the matter at the threshold.

II.

A.

In determining whether diversity jurisdiction exists, a corporation is deemed to be a citizen of both the state in which it is incorporated

8

and the state in which it has its principal place of business. 28 U.S.C.A. § 1332(c)(1) (West 1993). It is undisputed that SCV is incorporated in Texas, and not in South Carolina. The pertinent query, then, is whether the company will nonetheless be deemed to be a citizen of the latter by having its principal place of business there. The district court answered in the negative, concluding that SCV's principal place of business was in New York.

The existence of subject matter jurisdiction is a legal question, which we review de novo. Yarnevic v. Brink's, Inc., 102 F.3d 753, 754 (4th Cir. 1996). The district court's findings of fact upon which the legal question is resolved may not be set aside unless they are clearly erroneous. See Sligh v. Doe, 596 F.2d 1169, 1171 (4th Cir. 1979). The district court may assert subject matter jurisdiction under Section 1332 in removed cases only if complete diversity of citizenship between the parties on either side of the dispute existed both at the time the suit was commenced in state court, and at the time of removal. Rowland v. Patterson, 882 F.2d 97, 99 (4th Cir. 1989) (en banc).

The suit at issue here was filed in the Court of Common Pleas for the Ninth Judicial Circuit of South Carolina on or about April 18, 1990. SCV removed the suit to the district court on May 22, 1990. The interlude of approximately five weeks between filing and removal is immaterial in this case, inasmuch as the appellants do not contend that SCV's citizenship status changed during that time.

B.

Relevant to ascertaining a corporation's principal place of business are (1) the location of its home office (sometimes called its "nerve center"), i.e., where the company's officers direct and coordinate its activities, and (2) the location where the bulk of those activities take place. Mullins v. Beatrice Pocahontas Co., 489 F.2d 260, 262 (4th Cir. 1974).

The district court noted that SCV's corporate offices were, at the time of filing and removal, located in the state of New York:

> Its officers and directors were there, its corporate decisions were made there, its correspondence was received there, its bills were paid from a bank account in New York, it filed its tax returns . . . and listed its address as being New York. So as far as the corporate niceties, . . . all of that took place in New York.

As to the more complex matter of determining where SCV conducted the bulk of its corporate activities, we agree with the district court's observation that those activities be viewed in the context of the company's raison d'etre. The court below found that SCV's overarching purpose was the ownership of the Andell tract as an investment property, and not necessarily for development. [2] The district court's finding is, in our opinion, not clearly erroneous.

Viewed in the proper light, it is clear that, prior to the removal of the instant action, the most substantial activity in which SCV was engaged was the management of the Andell tract so as to realize the maximum profit from its ownership. This was the case when SCV was essentially a passive investor in ESLP, and it remained so for a considerable time after SCV was constrained to take a more active role in overseeing the property following the dissolution of its partnership with Bullock and Sea Marsh.

Little actual development of the Andell tract occurred prior to May 22, 1990; that which did occur was at the instance of Bullock on behalf of ESLP.[3] The district court found that the acts performed by SCV concerning the property, from the time that the partnership was dissolved until the removal of this action to the district court, were ministerial in nature, designed primarily -- if not exclusively -- to

_____

[2] Though not determinative of the issue, it is worth noting that, under South Carolina law, the mere ownership of real or personal property by a foreign corporation, without more, does not constitute the transaction of business within the state. S.C. Code Ann. § 33-15-101(b)(9) (Law. Co-op 1990).

[3] For example, Bullock obtained a permit from the Coastal Council of South Carolina to build a bridge on the tract, and he negotiated with the owner of a neighboring development that hoped to obtain an easement to install sewer lines on the partnership property.

protect its ownership interest. We cannot say that the district court clearly erred in so finding.

Under these circumstances, we agree with the district court's conclusion that SCV's principal place of business during the relevant time period was New York, and not South Carolina. The district court's exercise of jurisdiction over the dispute was therefore proper.**4**

III.

Bullock and Sea Marsh maintain that the district court erred by dismissing the claims against the Hughes & Luce defendants on the ground that they were not subject to personal jurisdiction in the District of South Carolina. We disagree.

A court's exercise of personal jurisdiction must comport with due process, which requires that a defendant's activities create a substantial connection between himself and the forum state. Stover v. O'Connell Assocs., Inc., 84 F.3d 132, 136 (4th Cir.) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)), cert. denied, 117 S. Ct. 437 (1996).**5**

The connection between the Hughes & Luce defendants and South Carolina was, at best, tenuous. The acts alleged to have formed the basis for the appellants' claims occurred in Texas, were committed by

_____

**4 Accord Vareka Invs., N.V. v. American Inv. Properties, Inc.**, 724 F.2d 907 (11th Cir. 1984) (corporation's principal place of business was Ecuador, and not Florida, where it was formed as a passive investment vehicle and all corporate decisions were made in Ecuador).

**5** The assertion of jurisdiction over the defendant must also be authorized by the forum state's long-arm statute, which may impose greater restrictions on the court's authority than would otherwise be mandated by the Constitution. Stover at 134. The South Carolina courts have held, however, that the limits of its long-arm statute are conterminous with those of due process. See, e.g., Atlantic Soft Drink Co. of Columbia, Inc. v. South Carolina Nat'l Bank, 336 S.E.2d 876, 878 (S.C. 1985). In such a situation, "the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." Stover at 136 (citations omitted).

11

Texas citizens, and concerned Bullock's efforts to obtain financing in Texas from sources in Texas. Moreover, there is no evidence that Diamond or Hennessy were ever physically present in South Carolina during the relevant time period. Though a person's physical presence in the forum state is not an absolute prerequisite to a court's exercise of personal jurisdiction over him, his activities there must at least have been meaningful enough to serve as an analogue for physical presence. Id. (citing International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

There is no indication in the record that Diamond engaged in any activities in South Carolina. Virtually the same can be said of Hennessy; his mere ownership of a one-half interest in SCV is insufficient to establish his presence in South Carolina, particularly in light of the minimal business conducted there by the company.

Hutchinson was physically present in South Carolina, of course, but only in his role as counsel for SCV. An attorney's entry of a court appearance pro hac vice in the forum state, without more, is not a substantial enough contact to permit that court to exercise jurisdiction over his person. See Trinity Indus., Inc. v. Myers & Assocs., Ltd., 41 F.3d 229, 230 (5th Cir.), cert. denied, 116 S. Ct. 52 (1995). Indeed, Hutchinson's contacts with the putative forum here are even more attenuated than those present in Trinity, because, unlike the attorney-defendants in that case, he has had no professional relationship whatsoever with the prospective plaintiffs.[6]

It is manifest that Hughes & Luce itself could only establish a presence in South Carolina through the acts of its agents. Inasmuch as we conclude that none of the Hughes & Luce attorneys involved in this case are amenable to the jurisdiction of the court below, it follows that the firm is likewise beyond its reach. The district court committed no error in dismissing the Hughes & Luce defendants for want of personal jurisdiction.

_____

[6] Personal jurisdiction was ultimately held to exist over the attorney-defendants in Trinity, but only because the nature and extent of their previous representation of the plaintiff supported a finding that they had purposefully availed themselves of the privilege of doing business in the forum state. Id. at 231.

12

IV.

A.

We turn finally to the substantive matter before us: whether the district court abused its discretion in excluding the various evidence described in Section I, supra. See United States v. Boyd, 53 F.3d 631, 636 (4th Cir.) (stating applicable standard of review), cert. denied, 116 S. Ct. 322 (1995).

According to the appellants, the initial draft of the letter from CCI, Meeske's testimony that Jarchow approved the final version, Jarchow's remarks at the July 20, 1989, meeting, and the past incidents of SCV's supposed misbehavior were all critical to demonstrating that, but for the alleged intervention of Diamond and others, Bear, Stearns would have committed to financing Bullock and Sea Marsh's purchase of SCV's interest in ESLP. Indeed, the appellants' decision to forgo a direct challenge to the district court's determination that the evidence actually admitted was insufficient to present a jury issue[7] is a potent indication of the importance that they have attached to the excluded exhibits and testimony.

The draft, Meeske's testimony of Jarchow's approval, and Meeske's, Bullock's, and Kruse's testimony concerning Jarchow's remarks were all deemed by the district court to be inadmissible hearsay. See Fed. R. Evid. 802 (excluding hearsay evidence not admissible under a listed exception). SCV's previous acts of alleged obstruction, which the plaintiffs sought to admit as an exception to Rule 404(b)'s general prohibition against evidence of prior wrongful acts to prove the character of a party or witness, were ruled by the dis-

_____

[7] Diamond testified that the luncheon meeting with Jarchow had been postponed from weeks before, that it had not been prompted by anyone else in the firm, and that any mention of the Andell project arose within the larger context of the discussion, the purpose of which was to explore the possibility of reciprocal business referrals. Jarchow testified that, by the time of his luncheon with Diamond and Berry, he had already decided that time restraints and economic and geographic factors militated against Bear, Stearns providing Bullock with the financing that he had requested.

trict court to be irrelevant. See Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible.").

B.

The appellants admit the hearsay nature of the excluded evidence, but they contend that it was nevertheless admissible under the third exception to the hearsay rule, as probative of Jarchow's then-existing intent to commit Bear, Stearns to the Andell project on Bullock and Sea Marsh's behalf. The rule provides, in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . .

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed. . . .

Fed. R. Evid. 803(3).

Under this exception, the initial draft of the CCI letter might have been admissible. The probative value of the draft, however, is highly suspect. On its face, it expresses Bear, Stearns's "enthusiasm" and "high level of interest" in Bullock's proposal, but it can hardly be read as a definite commitment to the Andell project; indeed, the draft's final paragraphs suggest that Bear, Stearns's ultimate involvement in the deal is contingent upon the resolution of the partnership's ongoing difficulties in obtaining zoning approval from the town of Seabrook.

In view of the equivocal nature of the language used in the draft, the district court did not abuse its discretion by withholding it from the jury's consideration.[8] Inasmuch as it was not error for the district

_____

[8] The final version of the letter was admitted into evidence, but the jury was simultaneously instructed that it could not consider it as probative of Jarchow's intent to provide financing for Bullock and Sea Marsh.

14

court to have ruled the draft itself inadmissible, it could not have been erroneous for the court to have also excluded the evidence of Jarchow's approval of the draft's contents.

The evidence of Jarchow's remarks at the July 20 meeting similarly lacked significant probative value. Meeske, Bullock, and Kruse would all have testified that Jarchow cited Bear, Stearns's conflict of interest as the reason for the company's decision not to pursue Bullock's financing proposal. Bullock proffered further that Jarchow told him during the meeting that "we've got five names we've already set up to do this deal with, and I'm going to give you those names through Mr. Lang, who is not here right now. He should be in any minute." Lang never showed up.

Considered as a whole, Jarchow's alleged remarks prove no more than that, by the time of the July 20 meeting, he had already decided to reject Bullock's proposal. The remarks reveal nothing about the reason for Jarchow's decision, and they certainly do not indicate that he was influenced by Diamond or anyone else.

The remarks also provide little insight into whether Jarchow had ever made a firm decision to do business with Bullock. Moreover, even had the remarks been probative of Jarchow's state of mind at some time prior to the meeting, they would still not be admissible under Rule 803(3), which excepts from the hearsay rule only those statements tending to show the declarant's <u>then-existing</u> state of mind.

In other words, the rule permits the introduction of only those statements made more or less contemporaneously with the genesis of the state of mind, emotion, sensation, or physical condition of which the statement is thought to be probative. The state of mind or other condition thus established may, in turn, explain some future act performed by the declarant, but it may not serve as evidence of an action taken in the past. This concept is illustrated by the advisory committee's note:

> The exclusion of "statements of memory or belief to prove the fact remembered or believed" is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hear-

15

say statement, <u>to serve as the basis for an inference of the happening of the event which produced the state of mind.</u>

(emphasis supplied) (citing <u>Shepard v. United States</u>, 290 U.S. 96 (1933)).**9** In short, we are satisfied that the district court did not abuse its discretion by excluding the testimony of Jarchow's remarks at the July 20 meeting.**10**

C.

Bullock and Sea Marsh sought to introduce evidence that, during the pendency of the partnership, SCV resisted Bullock's efforts to have the tract zoned and portions of it sold off. The appellants maintain that SCV's resistance was evidence of its intent or plan from the beginning to prevent Bullock from raising enough cash to take control of ESLP, and therefore supports the inference that its agents intervened in Bullock's efforts to obtain financing from Bear, Stearns. According to the appellants, this evidence of SCV's alleged intent or plan to wrongfully obstruct Bullock should have been admitted under Fed. R. Evid. 404(b).

The district court found that SCV, under the partnership agreement, had an "absolute right" to disagree with Bullock's strategic decisions

_____

**9** <u>**See also**</u> 11 James Wm. Moore et al., Moore's Federal Practice § 803(3)[9] (2d ed. 1996) ("[Though n]othing in the text of Rule 803(3) explicitly prohibits backward inferences from states of mind other than memory or belief . . . the Advisory Committee's . . . position accords with the refusal of federal courts to allow backward inferences either from memory or belief <u>or from other mental states.</u>") (emphasis supplied) (citations omitted).

**10** Jarchow was not present at trial, so portions of his deposition were read into the record. The plaintiffs introduced Jarchow's testimony that the decision to reject Bullock's financing proposal had been made prior to the luncheon meeting with Diamond and Berry; they then attempted to impeach Jarchow's testimony by introducing the previously excluded evidence of the remarks that Jarchow allegedly made to Bullock and the others on July 20, 1989. The district court correctly rejected this attempted end-run. Though a party is permitted to impeach his own witnesses, <u>see</u> Fed. R. Evid. 607, he may not do so as a subterfuge to admit otherwise inadmissible evidence. <u>United States v. Morlang</u>, 531 F.2d 183, 190 (4th Cir. 1975).

16

regarding the disposition of the Andell tract. Consequently, the court expressed its skepticism that the evidence of SCV's disagreement had any probative value:

> The synopsis of the testimony proposed to be introduced by the plaintiff, I've read it in detail. I don't know what it proves. . . . I just don't see where all this is relevant to this case. . . . I don't think this shows any kind of motive, intent, bad conduct or anything under 404(b) that is relevant to this case.

We have examined the proffered evidence, and we hold that the district court's determination that it lacked relevance was not an abuse of its discretion.

V.

The judgment of the district court is affirmed, as is its subsequent order on remand regarding the jurisdictional question.

No. 94-1140 -- <u>AFFIRMED</u>
No. 96-1524 -- <u>AFFIRMED</u>

17