UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 05-4496

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LENDRO MICHAEL THOMAS,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Baltimore.  J. Frederick Motz, District Judge.  (CR-03-189)

Submitted:  June 1, 2006                Decided:  July 11, 2006

Before NIEMEYER, WILLIAMS, and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Martin H. Schreiber, II, BROWN, GOLDSTEIN & LEVY, L.L.P., Baltimore, Maryland, for Appellant.  Rod J. Rosenstein, United States Attorney, John F. Purcell, Jr., Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIUM

Lendro Michael Thomas appeals his convictions and 204 month sentence for various drug and gun crimes. Thomas argues that the district court erred at trial in excluding expert testimony concerning narcotic trafficking methods, admitting evidence that Thomas sold drugs on a previous occasion, and refusing to allow Thomas to call a Government investigator to testify about certain statements made by a deceased co-defendant. Thomas further contends that the district court erred in sentencing him as a career offender under the U.S. Sentencing Guidelines. Because we find Thomas's arguments unpersuasive, we affirm his convictions and sentence.

I.

On February 10, 2003, Edwin Matthews and Thomas were arrested on the 3400 block of Spelman Avenue, near the Cherry Hill public housing project in Baltimore, Maryland. Minutes before his arrest, Thomas was involved in the sale of two $10 gel caps, or doses, of heroin to an undercover Baltimore police detective, John Calpin. Calpin testified that he and his partner, Chris O'Ree, drove onto the 3400 block of Spelman Avenue, knowing that Cherry Hill was an "open air drug market." (J.A. at 105.)

Upon arriving, Calpin noticed a black male, who was later determined to be Matthews, dressed in a black knit hat and a dark

2

jacket over a hooded sweatshirt or jacket.  The police detectives slowed down their vehicle, and Matthews approached in order to initiate a drug sale, offering the detectives "dope, coke, ready, and weed," (J.A. at 108), which are street names for heroin, cocaine, crack cocaine, and marijuana, respectively.  Calpin asked for "two dope," at which point Matthews asked Calpin to follow him into an alleyway between two buildings.  There, Calpin saw another black male dressed in dark blue, whom he identified at trial as Thomas.  Calpin then gave the men a $20 bill, and Thomas gave Calpin two gel caps of heroin.

After the drug transaction, Calpin and O'Ree drove away and reported what had occurred, along with descriptions of Thomas and Matthews, to a waiting arrest team.  A few minutes later, Sargent Mark Janicki and his enforcement team arrived on the scene.  Upon arriving, Janicki saw Thomas leaning against a car on the 3400 block of Spelman.  Janicki, in plainclothes, approached Thomas and identified himself as a police officer.  Thomas then suddenly placed both of his hands inside his coat pockets.  Janicki immediately grabbed Thomas's hands because he was concerned Thomas was reaching for a gun.  Janicki then secured Thomas and removed a gun from Thomas's right coat pocket. Janicki also recovered from Thomas's coat pockets 51 gel caps of heroin and 30 vials of cocaine, all together amounting to an estimated total worth of $900.  Janicki also recovered a $20 bill from Thomas's pants

3

pocket, the same $20 bill that Calpin had traded for drugs shortly before Thomas's arrest. Matthews was also arrested, and Calpin positively identified the two men as the ones who sold him heroin.

On April 17, 2003, Thomas was indicted on four counts by a grand jury in the District of Maryland. Count 1 charged Thomas with possession with intent to distribute a mixture of cocaine and heroin, in violation of 21 U.S.C. § 841. Count 2 charged Thomas with distribution of heroin, in violation of 21 U.S.C. § 841. Count 3 charged Thomas with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Count 4 charged Thomas with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). Matthews was also charged with respect to Counts 1 and 2, but he died prior to trial.

On June 16, 2004, a jury returned verdicts convicting Thomas on all four counts of the indictment. On April 29, 2005, the district court sentenced Thomas to concurrent terms of 144 months of imprisonment on Counts 1, 2, and 4 and to a consecutive term of 60 months on Count 3, for a total sentence of 204 months. Thomas timely appealed, challenging both his convictions and sentence.

II.

Thomas argues that the district court erred by excluding his expert's testimony about narcotics trafficking methods in Baltimore after the court allowed the Government to present such evidence.

4

We review for abuse of discretion the district court's decision to admit or exclude evidence, see United States v. Hodge, 354 F.3d 305, 312 (4th Cir. 2004); see also United States v. Hopkins, 310 F.3d 145, 151 (4th Cir. 2002) (including expert testimony).

Prior to trial, both Thomas and the Government indicated their intent to call expert witnesses to testify about how the drug trade operates in Baltimore. Thomas wanted to present as an expert a former buyer and seller of narcotics in Baltimore. Thomas's "expert" would testify that street-level dealers divide possession of the drugs, the purchase money, and a firearm among separate individuals so that no one individual is in possession of all three items. The Government intended to introduce an expert who would testify that a dealer "[p]retty much can't do the [drug] business without a firearm around." (J.A. at 21.)

The district court made a preliminary ruling refusing to allow either side to present such testimony. The court noted that this was "a case about eyewitness identification and whether the jury believes it or not." (J.A. at 22.) Accordingly, the court wished to keep the testimony simple and prevent Thomas's "expert," who was not present at the scene of the crime, from testifying that "[w]hat the [G]overnment says happened didn't happen." (J.A. at 18.) The court, however, in making its ruling noted that the Government would be able to argue about the obvious "connection between guns and drugs, about who carries guns." (J.A. at 22.)

5

During Janicki's testimony at trial, the Government attempted to ask Janicki why he worried about guns during his undercover drug operations. Thomas objected based on the court's preliminary ruling disallowing expert testimony. A brief bench conference ensued, where the Government argued that it was not attempting to qualify Janicki as an expert; rather, it sought to ask only about one of the tools of the drug trade in order to prove Count 3 of the indictment, which charged Thomas with knowingly possessing a firearm in furtherance of a drug trafficking crime.

The district court allowed the Government to proceed on this point, while also explaining to Thomas that he would still not be allowed to call his "expert." The Government then questioned Janicki as follows:

Q. Detective, I think I asked you if it was unusual for you, based on your experience and this quantity of drugs, to find a firearm with a person, on a person carrying this amount of drugs?

A. No.

Q. Why not?

A. Over my years in my experience I've arrested many people with handguns that were selling drugs just for the fact that it's a dangerous business, one. You hear, I see it, people getting killed every day. They're selling drugs on the street corners. People robbing drug

6

dealers, it happens every day. It's been my experience that drug dealers that are selling carry weapons. (J.A. at 61-62.)

This was the full extent of Janicki's testimony on the question.

Thomas contends that by allowing Janicki's testimony, the district court was required to allow the testimony of Thomas's expert as well. We disagree.

The purpose of Janicki's testimony was to establish that, in his experience, firearms are common tools of the drug trade. This testimony was germane to Count 3 of the indictment, in which the Government had to prove that Thomas knowingly possessed a firearm in furtherance of a drug trafficking crime. See United States v. Ward, 171 F.3d 188, 195 (4th Cir. 1999) ("Guns are tools of the drug trade and are commonly recognized articles of narcotics paraphernalia."); United States v. Kennedy, 32 F.3d 876, 882 (4th Cir. 1994) (noting that "the law has uniformly recognized that substantial dealers in narcotics possess firearms") (internal quotation marks omitted); United States v. Grogins, 163 F.3d 795, 799 (4th Cir. 1998) (noting the "background fact that the connection between illegal drug operations and guns in our society is a tight one").

The theory of Thomas's defense, however, was one of mistaken identity. His theory was based on an argument that Thomas had neither drugs nor a firearm in his possession when he was arrested

7

and that the police were "mixed up" in their identification of Thomas. (J.A. at 199.) Thomas was not attempting to rebut the § 924(c) point that drugs and firearms go hand in hand. Rather, the purpose of the expert's testimony was to impeach the identification of Thomas via an expert who was not at the scene of the crime. In other words, Thomas sought to prove -- through an expert who was not at the scene -- that the police were "mixed up" because it was impossible for the same man to possess drugs, purchase money, and a firearm. The common practices of Baltimore drug dealers, however, were irrelevant to whether the jury believed Janicki's testimony that he seized drugs and a firearm from Thomas's person. Accordingly, the district court did not abuse its broad discretion in disallowing the testimony as irrelevant because this was a "simple case" concerning "eyewitness identification and whether the jury believes it or not." (J.A. at 22.) Furthermore, we hold that the district court also did not abuse its discretion in refusing to allow the expert testimony simply because a Government witness testified to the commonly recognized fact that people who sell drugs often carry firearms.

## III.

Thomas next argues that the district court violated Federal Rule of Evidence 404(b) by admitting evidence that he had sold drugs nine days prior to the sale at issue here. We conclude that

8

the district court did not abuse its discretion in admitting this evidence.

During trial, the Government called Detective Floyd Jones, who was prepared to testify that he made an undercover purchase of heroin from Thomas on February 1, 2003.  Thomas objected, arguing that Jones's testimony was barred by Rule 404(b), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .

Fed. R. Evid. 404(b).  The district court overruled the objection and allowed the testimony, basing its decision on Fourth Circuit precedent and its opinion that the testimony "goes both to intent and to identity."  (J.A. at 203.)

Rule 404(b) is an "inclusionary rule." United States v. Mark, 943 F.2d 444, 447 (4th Cir. 1991) (internal quotation marks omitted).  The rule acts as a bar on evidence that "tends to prove only criminal disposition." United States v. Higgs, 353 F.3d 281, 311 (4th Cir. 2003) (internal quotation marks omitted and emphasis in original).  Thus,

> evidence is admissible if (1) it is relevant to an issue, such as an element of an offense, and is not offered to establish the general character of the defendant; (2) it is necessary in the sense that it is probative of an essential claim or an element of the offense; (3) it is reliable; and (4) its probative value is not substantially outweighed by confusion or unfair prejudice

9

in the sense that it tends to subordinate reason to emotion in the factfinding process.

Id. (internal quotation marks and alterations omitted).

The evidence was relevant and necessary here because it went toward identity and intent, two issues that Thomas contested at trial and the Government was required to prove. See Mark, 943 F.2d at 448 ("[T]he relevance of the evidence derives from the defendant's having possessed the same state of mind in the commission of both the extrinsic act and the charged offense." (internal quotation marks omitted)); Hodge, 354 F.3d at 312 (holding that evidence of defendant's previous drug transaction "was relevant and necessary in that it tended to show the existence of a continuing narcotics business" as well as the defendant's "knowledge of the drug trade and his intent to distribute"); see also United States v. Cassell, 292 F.3d 788, 793 (D.C. Cir. 2002) (noting that "in cases where a defendant is charged with unlawful possession of something, evidence that he possessed the same or similar things at other times is often quite relevant to this knowledge and intent with regard to the crime charged" (internal quotation marks omitted)). The evidence was also reliable, in that Jones's testimony was sufficient to allow the jury to "reasonably conclude that the act occurred and that the defendant was the actor." Huddleston v. United States, 485 U.S. 681, 689 (1988). Finally, the evidence's probative value was not outweighed by

confusion or unfair prejudice because the evidence "did not involve conduct any more sensational or disturbing than the crimes with which [Thomas] was charged." United States v. Boyd, 53 F.3d 631, 637 (4th Cir. 1995). In sum, the district court did not abuse its discretion in allowing the testimony under Rule 404(b).

IV.

Thomas next argues that the district court erred in refusing to admit statements made by Matthews after his arrest. We conclude that any error the district court made in excluding the statements was harmless.

The Government interviewed co-defendant Matthews after his and Thomas's arrest. During that interview, Matthews claimed he was innocent of the charges and had been on the street in order to purchase drugs as opposed to selling. His statement attempted to implicate Thomas and another man, whom Matthews had identified prior to his death as "Fry," or "High Fry."

During trial, the defense called Antionette Bolden, who stated she was with Thomas on the day of his arrest. Bolden testified that the police also detained a man named High Fry that day before releasing him shortly thereafter. Bolden's testimony further implied that the police agreed to release High Fry in exchange for information about people in possession of guns or drugs. In response to Government questioning on cross-examination, Bolden

11

stated that she never attempted to report the existence of High Fry to the authorities.

Thomas contends that he should have been allowed to call a Government investigator as a witness in order to testify about Matthews's statement concerning the existence of High Fry because such "testimony would have corroborated Bolden's testimony and corrected the false impression that Bolden had invented Fry." (Appellant's Br. at 20.) We conclude, however, that the district court did not abuse its discretion in excluding testimony concerning Matthews's statement.

To the extent Thomas was offering Matthews's statement to prove the truth of the matter asserted, it was hearsay, see Fed. R. Evid. 801, and did not qualify under any exception based on the declarant's unavailability. See Fed. R. Evid. 804. To the extent the statement was being sought in order to prove that the Government failed adequately to investigate other leads, any error in excluding the statement was harmless. The motive of Matthews's statement was to explain his innocence by inculpating Thomas and an unknown third man, High Fry. Thomas offers no theory for how Matthews's statement -- which essentially replaced Matthews's alleged role with High Fry and incriminated Thomas just the same -- could have possibly created reasonable doubt sufficient to acquit Thomas. Accordingly, we hold that any error was harmless.

12

V.

Thomas also challenges his sentence, arguing that the district court erred in sentencing him as a career offender pursuant to U.S. Sentencing Guidelines Manual § 4B1.1 after a Maryland court found one of his prior convictions to be unconstitutional. We review de novo the district court's legal interpretations and its factual findings for clear error. United States v. Caplinger, 339 F.3d 226, 235-36 (4th Cir. 2003).

Prior to sentencing, Thomas petitioned the Maryland courts to vacate two 1992 armed robbery convictions to which he had pleaded guilty in the same proceeding on December 15, 1992.[*] Thomas's Petition for Writ of Error Coram Nobis contended, inter alia, that the convictions were constitutionally invalid because he was never informed of and did not understand the charges to which he pleaded guilty. The Circuit Court for Baltimore City recognized its agreement with Thomas's argument, noting that it did not believe that a court "could make a determination that petitioner understood the nature of the charges against him." (J.A. at 311.) Nonetheless, the court held that Thomas waived his right to challenge the conviction and failed to show that the waiver was not

---

[*] In addition to the 1992 convictions, Thomas had also been convicted of armed robbery in 1983. Thomas did not contest the validity of this 1983 conviction. Thus, even if Thomas's two 1992 convictions -- to which he pleaded guilty in the same proceeding -- were counted as a single offense, he would remain properly classified as a career offender under U.S. Sentencing Guidelines Manual § 4B1.1.

13

intelligent and knowing. Accordingly, the court denied the Petition.

At the outset, Thomas concedes that the district court would have erred had it allowed him collaterally to attack his prior Maryland conviction during his federal sentencing proceeding. See Custis v. United States, 511 U.S. 485, 496 (1994) (holding that a defendant may only collaterally attack a prior conviction used for sentence enhancement if that attack is based on a conviction obtained in violation of his right to counsel). Thomas, however, contends that he was not seeking collaterally to attack his conviction at sentencing. Rather, he argues that he had already successfully attacked the conviction in Maryland court and the district court erred in not recognizing that successful attack.

Thomas's argument cannot prevail. "[A] sentencing court must count a predicate conviction that has not been reversed, vacated, or invalidated in a prior case, unless federal law or the Constitution secures the defendant's right to challenge the conviction in the current sentencing proceeding . . . ." United States v. Bacon, 94 F.3d 158, 161 (4th Cir. 1996) (emphases added). The Maryland court did not reverse, vacate, or invalidate any of Thomas's prior convictions. Rather, the court denied his petition, thus allowing the convictions to stand. Whether the state court's denial of the petition was based on substantive or procedural grounds is immaterial in this case. Here, Thomas's convictions

14

remained valid in the state of Maryland and the district court had no discretion to ignore those convictions. Accordingly, the district court did not err in sentencing Thomas as a career offender.

## VI.

In sum, we affirm Thomas's convictions and sentence. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the Court and argument would not aid the decisional process.

AFFIRMED