**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James Howard VAN METRE, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James Howard VAN METRE, Defendant–Appellant.**

Nos. 96–4669, 96–4670.

United States Court of Appeals, Fourth Circuit.

Argued March 2, 1998.

Decided July 10, 1998.

---

**ARGUED:** Kimberly Dunn Spelman, Gregg Lewis Bernstein, Martin, Junghans, Snyder & Bernstein, P.A., Baltimore, Maryland, for Appellant. Carmina Szunyog Hughes, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Lynne A. Battaglia, United States Attorney, Andrew G.W. Norman, Assistant United States Attorney, Baltimore, Maryland, for Appellee.

Before WILKINSON, Chief Judge, and WILLIAMS and MICHAEL, Circuit Judges.

WILLIAMS, Circuit Judge:

A federal jury found James Howard Van Metre guilty of kidnapping Holly Ann Blake in violation of 18 U.S.C.A. § 1201(a)(1) (West 1984), and Van Metre pleaded guilty to solicitation to commit a crime of violence in violation of 18 U.S.C.A. § 373 (West Supp.1997). At his sentencing hearing, the district court imposed a life sentence upon Van Metre for the Blake kidnapping and twenty years for solicitation. Van Metre now appeals his kidnapping conviction and both of his sentences. For the reasons discussed below, we affirm Van Metre's conviction and his kidnapping sentence. We vacate, however, his sentence for solicitation and remand to the district court for resentencing consistent with this opinion.

I.

In September of 1991, Van Metre began frequenting Spangler's Diner in Gettysburg, Pennsylvania. While there, he met Blake, a waitress at the diner, and eventually asked her out on a date. On September 26, eye witnesses reported that Van Metre entered the parking lot of Distelfink's Drive–In Restaurant, which is located about 1/4 mile from Spangler's, and began talking to Blake, who was waxing her car in the lot. The witnesses further related that Blake appeared to voluntarily get into Van Metre's car and that the couple then drove away.

According to Van Metre's subsequent confessions, the following tragedy occurred soon thereafter. After driving around for awhile, the couple drove to a farm that Van Metre's brother was renting in Carroll County, Maryland, a short distance from the Pennsylvania state line. Upon arrival at the farm, Van Metre and Blake exited the automobile and, according to Van Metre, began engaging in consensual sexual foreplay. At some point, however, Blake made a derogatory comment regarding Van Metre's anatomy. As a re-

sult, he went into a rage and strangled her to death. Van Metre admitted that it took several minutes to kill Blake and that she struggled for her life. After killing Blake, Van Metre returned to his automobile where he discovered some of Blake's belongings. Van Metre left the scene, but returned after dark at which time he started a large fire and burned Blake's body and her belongings. The next morning, he disposed of her ashes along a nearby river bank. When Blake failed to return home the night of September 26, her ex-husband called the Pennsylvania State Police to report her missing. The police discovered Blake's car at Distelfink's the next morning. As a result of witness interviews, the police learned that Blake had last been seen in the company of Van Metre.

Following routine procedure, Pennsylvania Trooper Theodore Kotula discovered that there was a valid Pennsylvania state civil bench warrant for contempt of court outstanding against Van Metre arising out of his purported violation of a Protection from Abuse order in favor of his wife. Five days later, on October 2, 1991, Kotula learned that Van Metre might be staying at the Gateway Motel in Chattanooga, Tennessee. Kotula immediately notified Sergeant Mark Rawlston of the Chattanooga Police Department that Van Metre, a suspect in the disappearance of Blake and in the kidnapping and rape of another Pennsylvania woman, Mary Yohe, was in Chattanooga.[1] Kotula requested that the Chattanooga authorities arrest Van Metre pursuant to the outstanding Pennsylvania warrant.[2] In response to Kotula's request, Rawlston set up surveillance at the Gateway Motel. After verifying Van Metre's presence at the motel, Rawlston, assisted by a SWAT team, entered Van Metre's room and arrested him at approximately 11:00 p.m. on the night of October 2, 1991. The Chattanooga

authorities recovered a single marijuana cigarette in Van Metre's room. Van Metre was transported to the Chattanooga Police Department.

At approximately 2:45 a.m., Van Metre arrived at Rawlston's office where he was read his *Miranda* rights and signed a waiver-of-rights form. Rawlston then proceeded to question Van Metre about the disappearance of Blake and the assault of Yohe. Van Metre responded that he and Blake had driven around together at an undisclosed time for several hours in his car. He stated, however, that he let Blake out of his car at the Sheets Motel in southern Pennsylvania and that he had not seen her again. Van Metre denied any knowledge of Yohe. At approximately 3:00 a.m., Van Metre was transported to the Chattanooga City Jail where he was booked as a fugitive from the State of Pennsylvania. He was also charged with simple possession of marijuana and failure to appear on the traffic violations. At approximately 5:00 p.m. on October 3, Van Metre signed a waiver-of-extradition form.

Kotula and Corporal Lester Freehling of the Criminal Investigation Division of the Pennsylvania State Police arrived in Chattanooga later that night. The next morning, October 4, they obtained and executed a search warrant of Van Metre's automobile. Finally, at approximately 10:30 p.m., Kotula and Freehling met with Van Metre. After being advised of his rights, Van Metre signed another waiver-of-rights form. Upon questioning by the Pennsylvania authorities, Van Metre initially denied any knowledge of the Blake or Yohe incident. After several hours, however, Van Metre confessed to Freehling that he was guilty of the rape of Yohe and the murder of Blake. Before each state-

1. In the early morning hours of September 15, 1991, a man later identified as Van Metre entered Mary Yohe's home near East Berlin, Pennsylvania. After almost choking her to death, he forced Yohe into his vehicle. Yohe's assailant then drove her to a remote area where he threatened her with a knife, tied her up, and repeatedly assaulted, raped, and sodomized her over several hours. Throughout the ordeal Yohe begged her assailant to spare her life. Fortunately, the man relented, drove Yohe back to her home, and released her.

2. As a result of his conversation with Kotula, Rawlston ran a check on Van Metre and discovered that he had two outstanding warrants in Chattanooga for failure to appear on traffic violations. The "no show" warrants authorized Rawlston to take Van Metre into custody and transport him to the city jail to be held until either he made bond or was transported to a preliminary hearing in city court.

ment, Van Metre was again read his *Miranda* rights, and he waived them each time. These statements were initially tape-recorded and then reduced to writing.

After obtaining these confessions, Van Metre was taken to the Chattanooga City Court on October 5, 1991, where he again waived extradition to Pennsylvania. That night, Kotula and Freehling began transporting Van Metre back to Pennsylvania. The next morning, October 6, while en route to Pennsylvania, Van Metre directed Kotula and Freehling to the Blake murder scene in Carroll County, Maryland. At that point, the Maryland authorities took over the investigation. Van Metre walked through the murder scene with the Pennsylvania and Maryland police during which time they recovered numerous pieces of evidence, including Blake's car keys, two knives, and a set of handcuff keys.

The next day, October 7, Van Metre was arraigned on the Yohe charges before a Pennsylvania magistrate. Later that evening, Van Metre again waived his rights and gave a taped confession to the Blake murder to Pennsylvania Trooper First Class Wehland. The confession was reduced to writing and reviewed by Van Metre. Van Metre agreed that he had no additions or corrections, but requested the presence of his attorney before he signed it. At that point, the interview ceased.

On April 16, 1993, a jury in the Circuit Court of Carroll County, Maryland, convicted Van Metre of the first degree murder of Holly Ann Blake. Van Metre was sentenced to life in prison without parole. On appeal, however, the Maryland Court of Special Appeals vacated Van Metre's conviction, holding that the state had failed to bring him to trial within the period required by Maryland Rule 4–271, Maryland's state law equivalent of the Speedy Trial Act. *See Van Metre v. State,* 100 Md.App. 809 (1994) (unpublished). In November of 1994, Van Metre was convicted of the kidnapping and rape of Mary Yohe in the Court of Common Pleas of Adams Coun-

ty, Pennsylvania. He received a sentence of 35 years.

## II.

On November 9, 1995, a federal grand jury returned an indictment charging Van Metre with kidnapping Holly Ann Blake in violation of 18 U.S.C.A. § 1201(a)(1) (West 1984).[3] Van Metre pleaded not guilty. On December 6, 1995, the Government gave notice that it intended to introduce evidence at trial indicating that Van Metre had been convicted in Pennsylvania state court of kidnapping and sexually assaulting another woman, Mary Yohe, eleven days prior to his alleged kidnapping of Blake. Van Metre filed a motion *in limine* to exclude the Yohe evidence under Rules 403 and 404(b) of the Federal Rules of Evidence. He also moved to suppress his various statements made to the Pennsylvania and Maryland state police between October 3 and October 7, 1991, and all evidence seized as a result thereof, alleging that the statements were obtained in violation of his Fourth, Fifth, and Sixth Amendment rights. After a pretrial hearing on the motions, the district court denied Van Metre's motions. In a Memorandum Opinion dated April 26, 1996, the district court concluded that the Yohe evidence was admissible under Rule 404(b) for the limited purpose of showing Van Metre's intent. The district court rejected Van Metre's claims that his statements were obtained in violation of his constitutional rights, finding specifically that Van Metre's arrest was legal and that the delay in presenting him for arraignment was insufficient evidence to indicate that his confessions were involuntary.

Also in April, just prior to the Blake trial, James Jackson, an inmate at the Baltimore City Detention Center, informed the Government that Van Metre was trying to arrange the murder of Yohe. Jackson told the FBI that Van Metre had approached him about killing Yohe. To corroborate his story, Jackson turned over a hand-drawn map detailing the location of Yohe's home to the FBI. Jackson was then placed in a holding cell at

---

**3.** On March 14, 1996, the grand jury returned a superseding indictment against Van Metre that was not substantively different from the original indictment. Van Metre also pleaded not guilty to the superseding indictment.

the courthouse with Van Metre where he tape recorded a conversation in which Van Metre reiterated that he wanted Yohe "terminated."

Subsequently, on May 1, 1996, the grand jury returned an additional indictment against Van Metre charging him with (1) solicitation to kill a government witness to prevent her attendance and testimony at trial, see 18 U.S.C.A. § 1512(a)(1)(A) (West Supp.1997); (2) attempting to use intimidation or physical force, or to corruptly persuade another to prevent the testimony of a witness at trial, see 18 U.S.C.A. § 1512(b)(1) (West Supp.1997); (3) obstructing justice, see 18 U.S.C.A. § 1503(a) (West Supp.1997); and (4) solicitation to commit a crime of violence, see 18 U.S.C.A. § 373 (West Supp.1997). Van Metre pleaded not guilty to the additional charges.

On May 14, 1996, Van Metre filed a motion waiving his right to a trial by jury and requesting a bench trial for the Blake kidnapping. The district court denied the motion. On May 17, Van Metre filed another motion in limine to exclude all evidence related to the solicitation from the kidnapping trial. The district court denied the motion, concluding that the evidence was admissible to demonstrate consciousness of guilt and criminal intent.

The kidnapping trial proceeded and on May 29, 1996, the jury found Van Metre guilty of kidnapping Blake. On July 26, 1996, Van Metre pleaded guilty to Count 4 of the second indictment—soliciting another to commit a crime of violence in violation of 18 U.S.C.A. § 373.

On August 14, 1996, the district court sentenced Van Metre on the solicitation and kidnapping convictions. After hearing the arguments of both Van Metre and the Government and considering the Presentence Report, the district court imposed concurrent sentences of life imprisonment for kidnapping and twenty years for solicitation. The district court ordered these sentences to run consecutively to Van Metre's Pennsylvania state sentence for his crimes against Yohe. Van Metre filed a timely appeal of his conviction for kidnapping and his sentences for both kidnapping and solicitation.

III.

Van Metre challenges his conviction for the kidnapping of Blake on several grounds. First, he contends that his confessions and the direct evidence obtained as a result thereof should have been suppressed because they were obtained in violation of his Fourth, Fifth, and Sixth Amendment rights. Second, Van Metre challenges the admission of evidence regarding his kidnapping and rape of Yohe and his solicitation for the murder of Yohe under Rules 403 and 404(b) of the Federal Rules of Evidence. Finally, he argues that the district court should have granted his motion for a bench trial to guarantee his Sixth Amendment right to an impartial jury. For the reasons that follow, we reject Van Metre's claims and affirm his conviction.

A.

Van Metre makes three arguments in support of the suppression of his confessions and the evidence obtained as a result thereof. First, he contends that his arrest, predicated upon a Pennsylvania civil bench warrant, was unlawful in violation of the Fourth Amendment because the Tennessee authorities failed to obtain a "fugitive of justice" warrant for his arrest as required by Tennessee law. Next, Van Metre argues that because the Tennessee authorities did not have a valid warrant for his arrest, they violated his Fifth and Sixth Amendment rights when they failed to promptly present him before a magistrate. Finally, he contends that his confessions were involuntarily obtained in violation of his rights under the Fifth Amendment. We will address each of Van Metre's arguments in turn.

1.

Van Metre contends that his confessions and the evidence obtained as a direct result thereof should have been suppressed because they were fruits of an illegal arrest. See Brown v. Illinois, 422 U.S. 590, 602–03, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (holding that evidence obtained as a result of an illegal arrest in violation of the Fourth Amend-

ment must be suppressed). Specifically, Van Metre asserts that the Tennessee authorities' failure to obtain a fugitive of justice warrant prior to arresting him pursuant to the Pennsylvania warrant rendered his arrest illegal. As a result, he contends that all evidence obtained subsequent to his arrest was "tainted fruit" that should have been suppressed. We disagree.

■ Van Metre's reliance upon Tennessee state law is misplaced. As this Court held in *United States v. Clyburn*, 24 F.3d 613 (4th Cir.1994),

> [T]he general rule ... is that evidence admissible under federal law cannot be excluded because it would be inadmissible under state law. The federal inquiry has not turned on whether a state officer violated state law in securing probative evidence. Rather, the proper standard for evaluating illegal ... seizure claims in federal courts has uniformly been whether the actions of the state officials in securing the evidence violated the Fourth Amendment to the United States Constitution.

*Id.* at 616 (internal quotation marks and citations omitted); *cf. Ralph v. Pepersack*, 335 F.2d 128, 136 (4th Cir.1964) (noting the "significant distinction between police action which is unlawful because violative of constitutional provisions and police action which merely fails to accord with statute, rule or some other nonconstitutional mandate"). The Supreme Court has similarly noted in a civil suit for damages arising out of an official's allegedly unconstitutional action that "[t]he problem is not whether state law has been violated but whether an inhabitant of a State has been deprived of a federal right by one who acts under 'color of any law.'" *Screws v. United States*, 325 U.S. 91, 108, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (plurality opinion); *see also Street v. Surdyka*, 492 F.2d 368, 371 (4th Cir.1974) (holding that even if the officer "violated Maryland arrest law, he cannot be liable under § 1983 unless he also violated the federal constitutional law governing ... arrests").

■ In this case, we have no fewer than three valid warrants for Van Metre's arrest. Therefore, unless Van Metre can demonstrate that these warrants are constitutionally deficient, he has no basis for asserting that his arrest was made in violation of the Constitution. We agree with the district court's observation that "[f]rom a Constitutional standpoint it is only important that there were valid warrants at the time of the arrest. Because the police had valid warrants, the arrest was legal." (J.A. at 177–78.) That the arrest may or may not have been conducted in accordance with Tennessee state law is irrelevant to our analysis. Van Metre was tried in federal court on federal charges. "Importing the particularized requirements of state standards into this federal proceeding would undermine the policy favoring uniformity of federal evidentiary standards, and would make the results of federal prosecutions ... depend on the fortuity of the defendant's being arrested in one state or another." *Clyburn*, 24 F.3d at 616 (internal quotation marks and citations omitted) (omission in original). Because Van Metre makes no substantive challenge to the constitutional sufficiency of the outstanding warrants, we conclude that his arrest was lawful.

### 2.

As a result of the aforementioned conclusion, we may quickly dispose of Van Metre's second challenge to the admissibility of his confessions. Van Metre contends that the Tennessee authorities' failure to present him before a magistrate promptly after his arrest violated his Fourth Amendment rights, thus rendering his arrest presumptively unconstitutional. In *Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), the Supreme Court warned that "persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause." *Id.* at 53, 111 S.Ct. 1661 (citing *Gerstein v. Pugh*, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). The Court then held that a detention of more than forty-eight hours without a judicial determination of probable cause is presumed unconstitutional unless the state can demonstrate the existence of a bona fide emergency or other extraordinary circumstances. *See id.* at 56–57, 111 S.Ct. 1661.

The Government does not dispute that more than forty-eight hours passed between Van Metre's arrest and his arraignment. We agree with the Government, however, that while this delay may be a factor in determining the voluntariness of Van Metre's confession, it has no bearing on the validity of his arrest because he was arrested pursuant to a warrant. As a result, the rule in *Riverside* is simply inapplicable. As discussed in Part III.A.1, whether Van Metre was arrested pursuant to the Pennsylvania warrant or the Tennessee warrants, the constitutional requirements for Van Metre's arrest were met when neutral judges in both Pennsylvania and Tennessee issued their respective arrest warrants. *See Gerstein*, 420 U.S. at 116 n. 18, 95 S.Ct. 854 (noting that a hearing is unnecessary when an arrest is made pursuant to a warrant).

### 3.

Finally, Van Metre argues that the district court erred when it determined that his statements were not obtained in violation of his Fifth Amendment rights. We disagree and affirm the district court's holding that the confessions were voluntary and admissible.

Voluntariness of a confession is assessed by examining the totality of the circumstances surrounding the confession. *See Mincey v. Arizona*, 437 U.S. 385, 401, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *see also United States v. Braxton*, 112 F.3d 777, 781 (4th Cir.) (en banc), *cert. denied*, —— U.S. ——, 118 S.Ct. 192, 139 L.Ed.2d 130 (1997). When determining the admissibility of a confession in federal court, we consider (1) the delay between arrest and arraignment, (2) whether the defendant was advised of the nature of the charges against him, (3) whether he was informed of his right to remain silent and that his confession could be used against him, (4) whether he was informed of his right to counsel, and (5) whether counsel

was present when he gave the confession. *See* 18 U.S.C.A. § 3501(b) (West 1985).

Van Metre does not dispute that he was advised of his right to remain silent and his right to have an attorney present in accordance with *Miranda*. He contends, however, that the unexcusable delay between his arrest and arraignment and Rawlston's failure to inform him of the charges against him support a finding that his confession was involuntary. Although we are not bound by the district court's legal conclusions as to the voluntariness of a statement, we must defer to its underlying factual determinations unless clearly erroneous. *See Braxton*, 112 F.3d at 781.

While we acknowledge that a fifty-five hour delay between arrest and arraignment is somewhat lengthy, it is only one factor to be considered when determining the admissibility of a confession.[4] The circumstances surrounding Van Metre's detention are not indicative of a repressive environment in which his "will [was] 'overborne' or his 'capacity for self-determination critically impaired.'" *United States v. Pelton*, 835 F.2d 1067, 1071 (4th Cir.1987) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The officers did not harm or threaten to harm Van Metre if he did not answer their questions. Nor was he held incommunicado or in seclusion. The officers did not subject Van Metre to continuous and unrelenting questioning.[5] Nor was he deprived of food or rest. *See United States v. Elie*, 111 F.3d 1135, 1143 (4th Cir.1997) (noting factors that would render a confession involuntary and citing cases). In sum, we cannot find the kind of coercive police conduct that is necessary to render Van Metre's confessions involuntary under the Fifth Amendment. *See Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'

---

**4.** The Supreme Court has held that the six hour safe harbor provision of 18 U.S.C.A. § 3501(c) is not triggered if the defendant is held only on state charges by state or local authorities. *See United States v. Alvarez–Sanchez*, 511 U.S. 350, 358, 114 S.Ct. 1599, 128 L.Ed.2d 319 (1994).

**5.** Van Metre was questioned only twice and for short durations.

within the meaning of the Due Process Clause").

█ We also reject Van Metre's contention that Rawlston's alleged failure to inform Van Metre of the nature of the investigation should weigh in favor of a finding that his confession was involuntary. Although Rawlston had no duty to advise Van Metre of the identity of the specific offense for which he was being questioned, *see Braxton,* 112 F.3d at 784, Van Metre cannot credibly argue that he was not on notice as to what the authorities were investigating. Within minutes of his initial interview, Rawlston questioned Van Metre about the disappearance of Blake and the sexual assault of Yohe.

Van Metre was fully informed of his rights pursuant to *Miranda* numerous times throughout his detention, and he waived them prior to each confession. There is simply no evidence that any force, coercion, or inducement was used to obtain statements from Van Metre. As a result, based upon the totality of the circumstances, we hold that Van Metre's confessions were voluntarily obtained and therefore admissible.

### B.

Van Metre also challenges his conviction on the grounds that Yohe's testimony detailing her kidnapping and sexual assault by Van Metre and Jackson's testimony recounting Van Metre's solicitation of the murder of Yohe were introduced merely to impugn his character, *see* Fed.R.Evid. 404(b), and that the potential prejudice of the testimony substantially outweighed its probative value, *see* Fed.R.Evid. 403. We conclude that the district court did not abuse its discretion when it admitted the evidence of Van Metre's prior bad acts. *See United States v. Powers,* 59 F.3d 1460, 1464 (4th Cir.1995) (holding that the district court's decision to admit evidence under Rule 404(b) is discretionary and will not be overturned unless it is "arbitrary or irrational").

█ Before addressing the merits of Van Metre's particular claims, it is instructive to set out the pertinent rules and case law. Rule 404(b) of the Federal Rules of Evidence prohibits the introduction of "[e]vidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith." Fed. R.Evid. 404(b). Such evidence may be admissible, however, for other purposes. These include, but are not limited to, "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b). Because this list is illustrative, rather than exclusive, Rule 404(b) is considered a rule of inclusion. *See Powers,* 59 F.3d at 1464 (characterizing Rule 404(b) "as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition" (internal quotation marks omitted)).

█ Extrinsic or prior act evidence is admissible under Rule 404(b) if the evidence is (1) relevant to some issue other than character, (2) necessary to prove an element of the crime charged, and (3) reliable. *See id.* Once the evidence has satisfied the above criteria, it may be admitted unless "its probative value is *substantially* outweighed by its prejudicial effect." *Id.* (internal quotation marks omitted).

█ Accordingly, our first inquiry is into the relevancy of the extrinsic evidence. Evidence is relevant if it has any tendency to make the existence of any determinative fact more probable than it would be absent the evidence. *See* Fed.R.Evid. 401. As a result, "[t]he threshold for relevancy is relatively low." *Powers,* 59 F.3d at 1465; *see also United States v. Queen,* 132 F.3d 991, 998 (4th Cir.1997) (acknowledging that relevancy requires only a finding that the evidence be "worth consideration by the jury" or have a "plus value" to be admissible). To be relevant under Rule 404(b), however, the evidence must be "sufficiently related to the charged offense." *Powers,* 59 F.3d at 1465 (internal quotation marks omitted).

█ Having established the relevance of the prior bad act, we must next determine the necessity of the evidence to the Government's case. "Evidence is necessary where, considered in the light of other evidence available to the government, it is an essential part of the crimes on trial." *Queen,* 132 F.3d

at 998 (internal quotation marks and citations omitted); *accord Powers,* 59 F.3d at 1466. Finally, the evidence is reliable if it is "sufficient to allow the jury to 'reasonably conclude that the act[s] occurred and that the defendant was the actor.'" *Powers,* 59 F.3d at 1467 (quoting *Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988)) (alterations in original).

■ Rule 403 of the Federal Rules of Evidence, however, prohibits the introduction of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403; *see also Queen,* 132 F.3d at 994. We have interpreted Rule 403 to require the exclusion of evidence "only in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Powers,* 59 F.3d at 1467 (internal quotation marks omitted).

With these principles in mind, we turn to the circumstances of this appeal.

### 1.

■ The district court ruled that the Government could present evidence of the kidnapping and sexual assault of Yohe, concluding that (1) the evidence was relevant to the issue of intent, (2) the assault of Yohe was necessary to prove Van Metre's intent to abduct Blake because there was no direct evidence of intent, (3) Van Metre's conviction by a Pennsylvania state jury attested to the reliability of Yohe's testimony, and (4) the danger of unfair prejudice did not outweigh the probative value of the prior crime. Van Metre challenges the admissibility of the Yohe evidence on the grounds that it was not probative of Van Metre's intent and that the prejudicial nature of Yohe's very emotional testimony regarding her abduction was overwhelming.

■ "A not-guilty plea puts one's intent at issue and thereby makes relevant evidence of similar prior crimes when that evidence proves criminal intent." *United States v. Sanchez,* 118 F.3d 192, 196 (4th Cir.1997); *see also Huddleston,* 485 U.S. at

685, 108 S.Ct. 1496 ("Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."); *Queen,* 132 F.3d at 996 ("Once an act is assumed to be done, the prior doing of other similar acts ... is useful as reducing the possibility that the act in question was done with innocent intent." (internal quotation marks omitted) (alteration in original)); *Sparks v. Gilley Trucking Co.,* 992 F.2d 50, 52 (4th Cir.1993) (holding that "when *intent* to commit a crime is at issue, we have regularly permitted the admission of prior acts to prove that element"). For the repeated actions to have probative value, however, "the earlier actions must be similar in nature to the charged acts." *Queen,* 132 F.3d at 996 (citing *United States v. Mark,* 943 F.2d 444, 448 (4th Cir.1991)).

■ This similarity may be proved "through physical similarity of the acts or through the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic offense and charged offense[ ]." *Id.* (internal quotation marks omitted). Of course, "the past conduct need not be identical to the conduct charged," but it must be "similar enough to be probative of intent." *United States v. Johnson,* 132 F.3d 1279, 1283 (9th Cir.1997).

In order to prove that Van Metre was guilty of kidnaping under 18 U.S.C. § 1201(a)(1), the government had to prove that he abducted Blake "for any reason which would in any way be of benefit" to him, *United States v. Childress,* 26 F.3d 498, 503 (4th Cir.1994), and that he formed this motive prior to crossing the Pennsylvania–Maryland state line, *see United States v. Hughes,* 716 F.2d 234, 237 (4th Cir.1983). One way for the government to satisfy this specific intent requirement was to prove that Van Metre's purpose in abducting Blake was, from the very start, for his own sexual gratification. *See United States v. Melton,* 883 F.2d 336, 338 (5th Cir.1989); *United States v. Link,* 728 F.2d 1170, 1171 (8th Cir.1984); *United States v. McBryar,* 553 F.2d 433, 434 (5th Cir.1977). This is why the government

offered Yohe's testimony—to prove that Van Metre met Blake and took her to a wooded area with the intent to sexually assault her.

The Government argues that Van Metre's abduction and rape of Yohe was sufficiently similar to his encounter with Blake to render Yohe's testimony probative of Van Metre's specific intent to sexually assault Blake when he transported Blake across the Pennsylvania Maryland state line. We agree. First, in the most telling similarity, Van Metre traveled alone with both women to wooded areas on farms. Van Metre drove Yohe to an isolated farm in the woods in Pennsylvania when no one else was around; similarly, he drove Blake to a farm in secluded woods in Maryland. Second, Van Metre committed sexual acts and violence against both victims soon after they arrived in the woods. Immediately upon reaching the farm in Pennsylvania, Van Metre began to viciously rape and assault Yohe. And Van Metre admitted that he engaged in intimate sexual activity with Blake, and then choked her to death, shortly after they arrived at the Maryland farm. Third, the victims resembled each other. The women were close together in age (Yohe was 29 and Blake was 28) when abducted, and both had a medium build and blonde hair. These three similarities suggest that Van Metre had the same purpose, sexual gratification, in mind when he drove Blake to the woods in Maryland as he did when he took Yohe to the wooded area in Pennsylvania. Further, the Yohe rape was not too distant in time, just 11 days prior to the Blake incident, to have lost its probative value. Therefore, we conclude that Yohe's testimony that Van Metre raped her was relevant to show that Van Metre had the specific intent to sexually assault Blake. *See, e.g., Umbaugh v. Hutto,* 486 F.2d 904, 906–07 (8th Cir.1973) (evidence that defendant raped another woman at the same secluded spot fifteen months earlier admissible to show motive in prosecution of defendant for kidnaping with intent to rape).

In addition, Yohe's testimony was unquestionably necessary, since it was key evidence of an essential element of the crime of kidnaping, specific intent. *See Queen,* 132 F.3d at 997 (explaining that prior bad acts evidence is necessary "when it is probative of . . . an element of the offense"). Moreover, Yohe's testimony was clearly reliable. *See Huddleston,* 485 U.S. at 689, 108 S.Ct. 1496 (explaining that prior bad acts evidence is reliable if the jury could "reasonably conclude that the act occurred and that the defendant was the actor").

Having determined that the Yohe evidence met the requirements for admissibility under Rule 404(b), the district court was nevertheless required to "conduct a balancing test to determine whether the evidence should nevertheless be excluded on the ground that its probative value is substantially outweighed by the danger of unfair prejudice." *United States v. Boyd,* 53 F.3d 631, 637 (4th Cir. 1995); *see also* Fed.R.Evid. 403. To exclude evidence pursuant to Rule 403, the district court must be convinced "that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and that this risk is disproportionate to the probative value of the offered evidence." *Powers,* 59 F.3d at 1467 (internal quotation marks omitted). The evidence of Yohe's abduction and violent repeated rape was certainly prejudicial to Van Metre. *See United States v. Grimmond,* 137 F.3d 823, 832–33 (4th Cir.1998) (holding that "damage to a defendant's case is not a basis for excluding probative evidence"). When we consider the significant probative value of the evidence, however, coupled with the district court's efforts to minimize its prejudicial impact, we conclude that the district court did not abuse its discretion in admitting the evidence.

The Yohe incident was no more disturbing than the circumstances of Blake's kidnapping and murder as related by Van Metre himself. *See Boyd,* 53 F.3d at 637 (holding that there is no unfair prejudice under Rule 403 when the extrinsic act is no more sensational or disturbing that the crimes with which the defendant was charged). The district court also gave a proper limiting instruction in its charge to the jury at the close of all the evidence. *See Powers,* 59 F.3d at 1468 (noting that cautionary instructions "generally obviate any prejudice"). These factors acted to dissipate the emotional impact of the challenged evidence. As a result, we conclude

that the district court's decision to admit the Yohe assault evidence was well within its discretion.

### 2.

Similarly, Van Metre contends that evidence that he solicited James Jackson to murder Yohe should not have been admitted because it was irrelevant to the issue of whether he kidnapped Blake and it was so prejudicial that it rendered an impartial verdict impossible. For the reasons articulated below, we conclude that the district court did not abuse its discretion in admitting the evidence.

As noted earlier, Jackson, one of Van Metre's fellow inmates at the Baltimore City Detention Center, informed the Government prior to the Blake trial that Van Metre had approached him about killing Yohe and had provided Jackson with a map to Yohe's home. The Government then sent Jackson, wired with a tape recorder, into a cell with Van Metre. Jackson successfully recorded Van Metre stating, among other things, that he wanted to "read the b——'s obituary" and that he would feel "no damn remorse" about Yohe's murder. (Supp. J.A. at 737–38.)

 Although not listed in Rule 404(b), spoliation evidence is generally admissible to show the defendant's consciousness of guilt of another crime. "Evidence of witness intimidation is admissible to prove consciousness of guilt ... under Rule 404(b), if the evidence (1) is related to the offense charged and (2) is reliable." *United States v. Hayden*, 85 F.3d 153, 159 (4th Cir.1996); *cf. United States v. Guerrero–Cortez*, 110 F.3d 647, 652 (8th Cir.) (acknowledging that "[a]n effort to intimidate a witness tends to show consciousness of guilt" and therefore is admissible under Rule 404(b)), *cert. denied*, —— U.S. ——, 118 S.Ct. 604, 139 L.Ed.2d 492 (1997); *United States v. Gatto*, 995 F.2d 449, 454–55 (3d Cir.1993) (holding that evidence of threats or intimidation of a witness is admissible under Rule 404(b) to show consciousness of guilt); *United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir.1991) (holding that "spoliation evidence, including evidence that the defendant threatened a witness, is generally admissible because it is probative of

consciousness of guilt"); *United States v. Mickens*, 926 F.2d 1323, 1329 (2d Cir.1991) (holding that an effort to intimidate a key Government witness is relevant to the issue of the defendant's state of mind and therefore admissible under Rule 404(b)); *United States v. Pina*, 844 F.2d 1, 9 (1st Cir.1988) (holding that evidence that defendant threatened an adverse witness is probative because it shows "that the defendant is willing to go to extreme measures to exclude relevant evidence from trial"). A defendant's attempt to threaten an adverse witness indicates "his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit." 2 Wigmore, Evidence § 278 (Chadbourn Rev.1979).

 Van Metre contends that the evidence that he attempted to have Yohe murdered did not establish his consciousness of guilt, but rather was an acknowledgment that the testimony of his former rape victim would be detrimental to his case. This argument misses the mark, however. Yohe's testimony was detrimental to Van Metre's case because, as discussed in Part III.B.1, it provided strong evidence from which the jury could infer Van Metre's intent to sexually assault Blake. A jury could reasonably infer from Van Metre's attempt to silence Yohe that he intended to sexually assault Blake. As a result, we readily conclude that the jury could infer Van Metre's consciousness of guilt from his attempt to have Yohe murdered. *Cf. Maddox*, 944 F.2d at 1230 (holding evidence that defendant mouthed the words "you're dead" to government witness during trial admissible under Rule 404(b)); *Mickens*, 926 F.2d at 1329 (holding evidence that defendant made a hand gesture in the shape of a gun towards government witness during trial admissible under Rule 404(b)). Accordingly, the evidence was properly admitted under Rule 404(b).

In addition, we reject Van Metre's assertion that the prejudicial impact of the evidence substantially outweighed its probative value. To minimize the prejudicial nature of the evidence that Van Metre attempted to have Yohe murdered, the district court gave

limiting instructions to the jury both prior to Jackson's testimony and as part of its final charge to the jury just before their deliberation. Moreover, while Jackson was allowed to testify as to his conversations with Van Metre and the map allegedly drawn by Van Metre was admitted, the tape-recorded conversation between Van Metre and Jackson was not played for the jury. In light of these precautions and the admitted brutality of the crime charged, *see Boyd*, 53 F.3d at 637, we conclude that the prejudicial impact of the solicitation evidence did not substantially outweigh its probative value.

### C.

■ Van Metre further contends that the district court's refusal to allow him to waive his right to a jury trial violated his Sixth Amendment right to an impartial trial. Van Metre argues that the evidence in this trial was so compelling that it necessarily resulted in a jury motivated by "passion and prejudice" rather than by the evidence. Specifically, he alleges that the particularly grisly details of Blake's murder as evidenced by his own tape-recorded confession, including details of how he strangled her, burned her body for several hours, and then shoveled her remains in a bucket before dumping them in a nearby river; the emotionally-charged testimony of Yohe; and the evidence surrounding his solicitation of the murder of Yohe prevented a jury from rendering an impartial verdict. We disagree and conclude that the district court was well within its discretion in denying Van Metre's request. *See United States v. Morlang*, 531 F.2d 183, 187 (4th Cir.1975) (holding that a district court's denial of a waiver of the right to a trial by jury will be reversed only if it constitutes manifest error).

■ Van Metre's assertion to the contrary, the Supreme Court has unequivocally held that a defendant does not have a constitutional right to a non-jury trial. In *Singer v. United States*, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), the Court explained:

> In light of the Constitution's emphasis on jury trial, we find it difficult to understand how the petitioner can submit the bald proposition that to compel a defendant in a criminal case to undergo a jury trial against his will is contrary to his right to a fair trial or to due process. A defendant's only constitutional right concerning the method of trial is to an impartial trial by jury. We find no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him.

380 U.S. at 36, 85 S.Ct. 783. On appeal, Van Metre points to subsequent dicta in *Singer* in which the Court appeared to recognize that "there might be some circumstances where a defendant's reasons for wanting to be tried by a judge alone are so compelling that the Government's insistance on trial by jury would result in the denial to a defendant of an impartial trial." *Id.* at 37, 85 S.Ct. 783. Even if we accept Van Metre's position that there may be a limitation on the power of the Government to refuse to consent to a waiver, we hold that the circumstances of this case are not so extraordinary to warrant a deviation from the preferred method of fact finding. *Cf. id.* at 35, 85 S.Ct. 783 ("Trial by jury has been established by the Constitution as the 'normal and ... preferable mode of disposing of issues of fact in criminal cases.'") (quoting *Patton v. United States*, 281 U.S. 276, 312, 50 S.Ct. 253, 74 L.Ed. 854 (1930) (omission in original)).

Van Metre asserts that the details of his crime are so gruesome and that the presentation of the collateral crimes against Yohe are so confusing as to require a bench trial to guarantee an impartial verdict based upon the evidence rather than emotion. We disagree. Van Metre's actions, while heinous, unfortunately were no more egregious than many other cases involving murder, kidnapping, or sexual assault. Federal and state juries are entrusted with rendering just verdicts in cases involving child molestation and incest, torture, mayhem, and multiple murders. We also reject the assertion that the admission of Van Metre's prior bad acts precluded a fair verdict for the reasons discussed in Parts III.B.1 and III.B.2. In fact,

except for conclusory assertions, Van Metre fails to present any evidence that the jurors acted irrationally. To the contrary, we are satisfied that the district court, through extensive voir dire and cautionary instructions, imposed the necessary safeguards to guarantee a just verdict. Accordingly, we affirm the district court's denial of Van Metre's motion to waive a jury trial and we affirm Van Metre's conviction for the kidnapping of Holly Blake.

## IV.

We now turn to Van Metre's sentencing claims. Van Metre challenges both his kidnapping and solicitation sentences. For the reasons that follow, we affirm the kidnapping sentence, but reverse the twenty-year solicitation sentence and remand to the district court for resentencing.

## A.

■ As a general rule, the district court should use the Guidelines Manual "in effect on the date that the defendant is sentenced." *U.S. Sentencing Guidelines Manual* § 1B1.11(a) (1995). If, however, use of the Guidelines Manual in effect on that date would violate the Ex Post Facto Clause, the district court should use the Guidelines Manual in effect on the date that the offense of conviction was committed. *See* U.S.S.G. § 1B1.11(b)(1); *see also United States v. Heater*, 63 F.3d 311, 331 (4th Cir.1995) (holding "that amendments to the Guidelines occurring after a defendant's offense but before sentencing should not be applied if doing so would increase the sentence, because that would violate the Ex Post Facto Clause in

Article I, § 9 of the United States Constitution"); *United States v. Morrow*, 925 F.2d 779, 782–83 (4th Cir.1991) (holding that the Ex Post Facto Clause applies to the federal Sentencing Guidelines); *cf. Miller v. Florida*, 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (recognizing that application of revised sentencing guidelines to a defendant whose crimes occurred before their effective date violated the Ex Post Facto Clause). The Guidelines further provide, however, that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3). According to the official commentary, this section applies even if, as a result of its application, the defendant is subject to a harsher penalty for the first offense. *See* U.S.S.G. § 1B1.11, comment. (backg'd).

Van Metre's Presentence Report recommended imposition of a life sentence in accordance with § 2A4.1 of the 1995 Guidelines Manual, the manual in effect at the time of sentencing.[6] Van Metre timely objected to the applicability of the 1995 Guidelines Manual to his kidnapping conviction. He claimed that application of the 1995 Guidelines Manual would result in a harsher sentence than the 1990 Guidelines Manual in effect at the time he committed the kidnapping, thereby violating the Ex Post Facto Clause of the Constitution. According to Van Metre's calculations, if he were sentenced under the 1990 Guidelines Manual, his final adjusted offense level would be only 35.[7] This offense

---

6. Section 2A4.1 (Kidnapping) of the 1995 Guidelines Manual provides a cross-reference to § 2A1.1 (First Degree Murder) for cases in which the victim of the kidnapping is killed under circumstances that would constitute murder under 18 U.S.C. § 1111. *See U.S. Sentencing Guidelines Manual* § 2A4.1(c)(1) (1995). In those instances, the Guideline provides that the base offense level for first-degree murder, rather than kidnapping, applies. Section 2A1.1 provides a base offense level of 43 for first-degree murder. *See* U.S.S.G. § 2A1.1. A base offense level of 43, regardless of a defendant's criminal history category, mandates the imposition of a life sentence. *See* U.S.S.G. Ch.5, Pt.A. (Sentencing Table).

7. The 1990 version of the Guidelines provides that the base offense level for kidnapping is 24. *See U.S. Sentencing Guidelines Manual* § 2A4.1(a) (1990). The guideline further provides, however, that:

 If the victim was kidnapped, abducted, or unlawfully restrained to facilitate the commission of another offense: (A) increase [the offense level] by 4 levels; or (B) if the result of applying this guideline is less than that resulting from application of the guideline for such other offense, apply the guideline for such other offense.

 U.S.S.G. § 2A4.1(b)(5). Prior to sentencing and on appeal to this Court, Van Metre asserted that,

level, combined with his criminal history category of IV, results in a sentencing range of only 235–293 months imprisonment. *See* U.S.S.G. Ch.5, Pt.A (Sentencing Table) (1990). Accordingly, Van Metre argued that U.S.S.G. § 1B1.11(b)(1) mandated application of the 1990 Guidelines Manual to his kidnapping conviction.

Without explanation, the district court apparently agreed with Van Metre that application of the 1995 version of the Guidelines would violate the Ex Post Facto Clause and, therefore, applied the 1990 Guidelines Manual to Van Metre's kidnapping conviction. On appeal, we need not determine whether the district court should have applied the 1995 Guidelines Manual as § 1B1.11(b)(3) directs because we affirm the district court's imposition of a life sentence upon Van Metre pursuant to the 1990 Guidelines Manual. *Compare United States v. Ortland,* 109 F.3d 539, 547 (9th Cir.) (holding that application of § 1B1.11(b)(3) violated the Ex Post Facto Clause when it resulted in the imposition of a harsher sentence for the offenses committed prior to enactment of the Guidelines in effect at the time of sentencing), *cert. denied,* —— U.S. ——, 118 S.Ct. 141, 139 L.Ed.2d 89 (1997), *with United States v. Bailey,* 123 F.3d 1381, 1403–07 (11th Cir.1997) (holding that application of § 1B1.11(b)(3) did not violate the Ex Post Facto Clause even though it resulted in the imposition of a harsher sentence for the offense committed prior to enactment of the Guidelines in effect at the time of sentencing because "a defendant knows, when he continues to commit related crimes, that he risks sentencing for all of his offenses under the latest, amended Sentencing Guidelines Manual"); *United States v. Cooper,* 35 F.3d 1248, 1250–53 (8th Cir.1994) (holding that application of § 1B1.11(b)(3) did not violate the Ex Post Facto Clause even though it resulted in the imposition of a harsher sentence for an offense committed prior to enactment of the Guidelines in effect at the time of sentencing because defendant was on notice when he committed an additional post–1991 amendment offense that was

part of the "same course of conduct" that the amended Guidelines increased the offense level for the pre–1991 offenses), *vacated,* 514 U.S. 1094, 115 S.Ct. 1820, 131 L.Ed.2d 742 (1995), *reinstated without opinion,* 63 F.3d 761 (8th Cir.1995), *cert. denied,* 517 U.S. 1158, 116 S.Ct. 1548, 134 L.Ed.2d 650 (1996); and *United States v. Regan,* 989 F.2d 44, 45 (1st Cir.1993).

As previously noted, the 1990 Guidelines Manual provides:

> If the victim was kidnapped, abducted, or unlawfully restrained to facilitate the commission of another offense: (A) increase [the offense level] by 4 levels; or (B) if the result of applying this guideline is less than that resulting from application of the guideline for such other offense, apply the guideline for such other offense.

U.S.S.G. § 2A4.1(b)(5) (1990). The district court found that Van Metre kidnapped Blake to facilitate her murder. As a result, the court invoked the "other offense" language under subsection (B) and computed Van Metre's sentence using the base offense level for first degree murder, rather than kidnapping. First degree murder carries a base offense level of 43. *See* U.S.S.G. § 2A1.1. A base offense level of 43 results in a mandatory life sentence. *See* U.S.S.G. Ch.5, Pt.A (Sentencing Table).

In addition to the above rationale, the district court stated that it also would impose a life sentence via an upward departure based upon Blake's death. *See* U.S.S.G. § 5K2.1, p.s. Because we readily conclude that such an upward departure is reasonable under these circumstances, we affirm the life sentence and need not address the district court's alternative reasoning.

 We review a district court's decision to depart from the Guidelines for abuse of discretion. *See Koon v. United States,* 518 U.S. 81, 116 S.Ct. 2035, 2048, 135 L.Ed.2d 392 (1996). In *United States v. Brock,* 108 F.3d 31 (4th Cir.1997), we articulated a framework for determining when a factor

---

because the evidence established a kidnapping to facilitate a sexual assault only, the applicable guideline section would be U.S.S.G. § 2A3.1 (criminal sexual abuse) which has a base offense

level of 27, plus an increase of 4 levels for injury under § 2A3.1(b)(4) and an additional 4 level increase for abduction under § 2A3.1(b)(5) for a final adjusted offense level of 35.

identified by the district court may support a departure. If the identified factor is an encouraged basis for departure and is not taken into account by the applicable guideline, the district court may exercise its discretion and depart. *See id.* at 34. If the factor is encouraged, but the applicable guideline has already adequately taken the factor into account, "then departure is permissible 'only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present.'" *Id.* at 34–35 (quoting *Koon,* 116 S.Ct. at 2045).

▪▪▪ The district court concluded that this was an atypical kidnapping case justifying an upward departure. The court specifically cited Blake's death as the basis for the departure. Death is an encouraged factor for upward departure. *See* U.S.S.G. § 5K2.1, p.s. Therefore, unless § 2A4.1 of the 1990 Sentencing Guidelines takes into account the death of a kidnapping victim as occurred in this case, the district court may upwardly depart on that basis. *See Brock,* 108 F.3d at 34.

Section 2A4.1 specifically provides for sentencing adjustments if the kidnapping victim is held for ransom, *see* U.S.S.G. § 2A4.1(b)(1); sustains "permanent or life-threatening bodily injury," *see* U.S.S.G. § 2A4.1(b)(2); is held with a deadly weapon, *see* U.S.S.G. § 2A4.1(b)(3); or is detained for a prolonged time period, *see* U.S.S.G. § 2A4.1(b)(4). The guideline also provides an adjustment if the kidnapping was done "to facilitate the commission of another offense," U.S.S.G. § 2A4.1(b)(5), such as murder. At first blush, it appears that this latter subsection may take into account a resulting murder. As Van Metre himself vehemently argues, however, the 1990 Guidelines Manual takes into account only the very limited circumstance of a defendant who kidnaps an individual for the purpose of killing her. We readily draw a distinction between that situation and one in which the defendant kidnaps an individual for other reasons, *i.e.,* ransom

or sexual assault, and only later forms the intent to murder her. Section 2A4.1 fails to take into account the latter, and perhaps more common, scenario.[8] *Cf.* U.S.S.G. § 2A4.1, comment. (backg'd.) ("Federal kidnapping cases generally encompass three categories of conduct: limited duration kidnapping where the victim is released unharmed; kidnapping that occurs as part of or to facilitate the commission of another offense (often, sexual assault); and kidnapping for ransom or political demand."). Accordingly, we hold that an upward departure based upon Blake's death was not an abuse of discretion.

▪▪▪ As to the extent of the departure, § 5K2.1, p.s., provides that:

Loss of life does not automatically suggest a sentence at or near the statutory maximum. The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation.... The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious injury was intended or knowingly risked, and the extent to which the offense level for the conviction ... already reflects the risk of personal injury.

U.S.S.G. § 5K2.1, p.s. In distinguishing among the levels of homicide, the district court found that Van Metre was guilty of first-degree murder. 18 U.S.C.A. § 1111 provides, in pertinent part:

Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any ... kidnapping, ... aggravated sexual abuse or sexual abuse, ... is murder in the first degree.

18 U.S.C.A. § 1111(a) (West Supp.1997). A jury found beyond a reasonable doubt that

8. As further evidence of the 1990 Guidelines' failure to take the victim's subsequent death into account, we note that the Sentencing Commission amended § 2A4.1 in 1991 to specifically provide that "[i]f the victim was killed under

circumstances that would constitute murder under 18 U.S.C. § 1111 ..., apply § 2A1.1 (First Degree Murder)." *U.S. Sentencing Guidelines Manual* § 2A4.1(c)(1) (1991).

Van Metre kidnapped Blake, and he does not challenge the sufficiency of the Government's evidence supporting the jury verdict. The jury's verdict, coupled with Van Metre's admission that he murdered Blake during the course of the kidnapping, supports the district court's finding that Van Metre murdered Blake. This finding, standing alone, justifies the imposition of a life sentence. *See United States v. Gary*, 18 F.3d 1123, 1131 (4th Cir.1994) (holding that "[a]nalogies to similar offenses or aggravating circumstances ... prov[ide] the best method for a principled determination of departures").

In addition to determining the level of homicide for which Van Metre was guilty, the district court considered Van Metre's overall dangerousness to the community and the extent to which Van Metre knowingly risked Blake's death. The district court noted that Van Metre was a "very dangerous man," (J.A. at 535) and that "this [was] a case in which public safety require[d Van Metre's] incarceration for as long as the law permits," (J.A. at 543). The district court further concluded that Van Metre knowingly risked Blake's death when he abducted her based upon his earlier experience with Yohe in which he threatened to murder her. Based upon the foregoing findings, we hold that the district court's imposition of a life sentence was not an abuse of discretion.

### B.

The district court relied upon Application Note 5 of § 5G1.3 of the Sentencing Guidelines to impose the statutory maximum on Van Metre for solicitation. Note 5 provides:

> *Complex situations.* Occasionally, the court may be faced with a complex case in which a defendant may be subject to multiple undischarged terms of imprisonment that seemingly call for the application of different rules. In such a case, the court may exercise its discretion in accordance with subsection (c) to fashion a sentence of appropriate length and structure it to run in any appropriate manner to achieve a

reasonable punishment for the instant offense.

U.S.S.G. § 5G1.3, comment. (n.5) (1995).

The Government concedes, and we agree, that the district court erroneously interpreted Note 5 to allow the imposition of the statutory maximum in this case. Note 5 simply addresses the imposition of concurrent or consecutive terms of imprisonment when the defendant is faced with numerous terms of undischarged prison time. Nothing in Note 5 allows the district court to depart from the applicable guideline range.[9] Accordingly, we must reverse Van Metre's solicitation sentence and remand for resentencing.

### V.

In conclusion, we affirm Van Metre's conviction and life sentence for kidnapping Blake. We reverse the district court's imposition of the statutory maximum twenty year sentence for solicitation for murder, however, and remand for resentencing.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

---

9. We note that the district court, while concluding that "this [was] such an atypical case [and] that [the court could not] believe the Sentencing Commission considered adequately the factors that are present ... when it set the guidelines," inexplicably denied that it arrived at the twenty year sentence via an upward departure. (J.A. at 543–44.) As a result, we are prevented from determining the extent to which an upward departure would have been reasonable under the circumstances.